# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | |
|---|---|
| Tracy Murrill, as Personal Representative of Robert Vincent Locke, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>NaphCare, Inc., Mobile County, Sheriff Paul Burch, Katie Erickson, and John Does 1-10<br><br>Defendants | |

# COMPLAINT

For their Complaint, Plaintiff Tracy Murrill, as Personal Representative of Robert Vincent Locke, deceased, by and through their attorneys, Romanucci and Blandin, LLC, and Maples & Connick, state as follows:

## I.    INTRODUCTION

1.    Mr. Locke entered the Mobile County Metro Jail with a serious neurological medical condition.

2.    Mr. Locke was known to have a history of chronic disequilibrium, subdural hematomas, and falls resulting in head injuries.

3.    Unfortunately for Mr. Locke, the institutions in charge of administering the Mobile County Metro Jail—Mobile County and Sheriff Paul Burch—contracted with a correctional medical provider called NaphCare, a company notorious for its failure to provide adequate medical care

1

4. Indeed, NaphCare has had the highest death rate among major correctional medicine contractors.

5. Through their contract with NaphCare, Mobile County and Sheriff Burch delegated a non-delegable duty to provide constitutional medical care to inmates at MCMJ to a company they knew repeatedly put inmates in danger.

6. One of the most common ways that NaphCare avoids providing decent healthcare to inmates is by refusing to refer inmates to the hospital when they are suffering an obviously serious medical need.

7. Mobile County knew of this practice of delaying transfers to the hospital, and even encouraged it, with one County Commissioner explicitly noting the following in a 2020 discussion about the County's contract with NaphCare: "If you have somebody who is in a severe situation such as a heart attack or something life-threatening to not transfer them would save you about $2,000 per day."

8. After this discussion, Mobile County voted to continue funding its contract with NaphCare. Sheriff Burch continued to implement the contract with NaphCare. NaphCare continued to implement its unconstitutional policies.

9. Because of these decisions by these institutional actors, as well as the conduct of their agents and employees, Mr. Locke was not timely referred to the hospital for his serious medical need, and he died.

## II.    JURISDICTION

10.  This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.

11.  The Court additionally has subject matter jurisdiction over Plaintiffs' state law claims under 42 U.S.C. § 1367 as those claims arise from the same transaction and occurrence as Plaintiffs' federal claims.

12.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as one or more of the Defendants resides in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## III.    PARTIES

13.  Robert Locke is the decedent in this matter. Plaintiff alleges that he died in Mobile County, Alabama on or about April 24, 2024 as a result of Defendants' wrongful conduct.

14.  Tracy Murrill was duly appointed as personal administrator of Robert Locke's estate. She brings this action for the wrongful acts, omissions, negligence, and deliberate indifference of the Defendants on behalf of all Mr. Locke's surviving beneficiaries.

15.  Sheriff Paul Burch the Sheriff of Mobile County and is responsible for the administration and operation of the Mobile County Metro Jail (MCMJ). He is sued in his official and individual capacities.

16.  Mobile County, by and through the Mobile County Commission, is responsible for the administration, funding, and construction of the Metro Jail. This includes ensuring the provision of healthcare at the Mobile County Metro Jail; adequate funds to meet the medical needs of inmates; and maintenance of the Jail, including through construction and expansion of jail facilities.

17.  NaphCare U.S., Inc., doing business as NaphCare, Inc., (NaphCare) is a private for-profit corporation duly incorporated under the laws of the State of Alabama and doing business in the state of Alabama. At all times relevant, NaphCare contracted with Defendants Mobile County and Sheriff Paul Burch to provide medical care to inmates at the Mobile County Metro Jail (MCMJ) and was the employer of Nurse Practitioner Katie Erickson as well as one or more John Doe defendants. Plaintiffs allegations against NaphCare extend to its parent companies, subsidiaries, and affiliated entities.

18.  Katie Erickson was at all times relevant a nurse practitioner and NaphCare employee or agent. She is sued in her individual capacity.

19.  John Does 1-5 are, on information and belief, NaphCare employees or agents who participated in Mr. Locke's assessment and/or treatment during the relevant time period . Plaintiff is currently ignorant of their identities and intends to amend this Complaint expediently upon learning them.

20.  John Does 6-10 are believed to be Mobile County, Mobile County Sheriff's Office, or MCMJ employees who participated in Mr. Locke's assessment and/or treatment during the relevant time period. Plaintiff is currently ignorant of

4

their identities and intends to amend this Complaint expediently upon learning them.

## IV.    FACTS COMMON TO ALL COUNTS

### A. Mr. Locke's detention at Mobile County Metro Jail

21. Mr. Locke was booked at MCMJ on February 15, 2024, then released on February 16 or 17, 2024.

22. Mr. Locke had been booked at MCMJ multiple times in the past, and both MCMJ and NaphCare personnel were aware he suffered from Alcohol Use Disorder.

23. Alcohol Use Disorder is a substance use disorder. It is a chronic, serious medical condition that warrants attention and treatment by medical professionals.

24. The Alabama Department of Corrections (ADOC) requires a treatment referral for patients with substance use disorders where clinically indicated.

25. On February 17, 2024, Mr. Locke was hospitalized at the University of South Alabama Hospital (USAH) as a trauma transfer for management of bilateral subdural hematoma in the context of multiple falls.

26. At USAH, he received a CT scan of his head and spine. Those CT scans reflected that he had two subacute chronic subdural hematoma in his brain, a midline shift, moderate cerebral atrophy, chronic small vessel ischemic disease, and severe degenerative changes in some of his vertebrae.

27. On February 19, 2024, Mr. Locke received an MMA embolization, a minimally invasive procedure to treat chronic subdural hematomas.

28. On February 20, 2024, Mr. Locke left USAH.

29. On February 21, 2024, Mr. Locke went back to the hospital to receive a CT scan, which showed no changes to the size of the hematomas and that the midline shift had gotten smaller. These results indicated that his subdural hematomas were stable.

30. On February 23, 2024, Mr. Locke was admitted to the Mobile County Metro Jail again.

31. Nurse Angela Ingram did initial screenings and physical assessments of Mr. Locke and found the following:

    a. Mr. Locke needed to be placed in administrative segregation to monitor his medical issues.

    b. Mr. Locke needed to be placed on a low tier bunk, indicating he was a known fall risk.

    c. Mr. Locke needed to be placed on "detox watch."

    d. Mr. Locke needed to receive a treatment plan for alcohol withdrawal, which included changes to his medication regimen and placing him on a low tier bunk. prescribing

    e. Mr. Locke needed to be prescribed Keppra twice a day for two weeks for seizure prophylaxis.

32. These directives indicate that NaphCare and correctional staff were aware of their responsibility to treat and monitor Mr. Locke's Alcohol Use Disorder, chronic disequilibrium, serious neurological condition, and fall risk.

33. Pursuant to the policies and practices of NaphCare and Mobile County, Mr. Locke was not actually placed on any detoxification protocol or medication-assisted treatment for his alcohol use disorder.

34. On February 24, 2024, Mr. Locke did not come out for medication pass, which is the period where NaphCare and MCMJ personnel distribute necessary medications to the inmates.

35. On February 26, 2024, NaphCare and MCMJ received a fax of Mr. Locke's medical records from USAH, including Mr. Locke's most recent CT scan reports reflecting his subdural hematomas.

36. On February 26, 2024, Mr. Locke did not come out for morning medication pass.

37. On February 28, 2024, Mr. Locke refused to have his blood pressure measured.

38. On February 29, 2024, Mr. Locke did not come out for morning medication pass.

39. On March 3, 2024, Mr. Locke did not come out for morning medication pass even after Correctional Officer Henderson called for him three times.

40. On March 4, 2024, Mr. Locke did not come out for morning medication pass.

41. On March 5, 2024, Mr. Locke did not come out for morning medication pass.

42. On March 6, 2024, Mr. Locke refused all medication and a blood pressure check, stating he only wanted to take his Trazadone.

43. On March 8, 2024, Mr. Locke did not come out for medication pass.

44. On March 9, 2024, Mr. Locke did not come out for medication pass.

45. Mr. Locke's repeated refusal to take his medication would have indicated to all NaphCare and correctional staff that his medical condition was deteriorating and that he was vulnerable to a critical incident.

46. On March 11, 2024, Mr. Locke was seen by Dr. William Schulte, a NaphCare physician. Dr. Schulte reviewed his chart, which showed that Mr. Locke had a CT scan that showed subdural hematomas in his brain on February 17 and 21, and that he had not been coming out for medication pass. Dr. Schulte did not document the recent hematomas in his chart entry nor did he develop a treatment plan for Mr. Locke.

47. On March 13, 2024, Mr. Locke did not come out for medication pass.

48. On March 15, 2024, Mr. Locke did not come out for medication pass.

49. On March 17, 2024, Mr. Locke did not come out for medication pass.

50. On March 18, 2024, at 4:14 p.m., Mr. Locke reported to Sheila Caulton, a NaphCare Licensed Practical Nurse, that he had fallen in his cell several times that day.

51. Caulton noted that Mr. Locke had an unsteady gait and a history of not complying with his medications, then referred him to "clinic."

52. On March 18, 2024, at 4:44 p.m., Katie Erickson, a NaphCare Nurse Practitioner, saw Mr. Locke in the clinic to assess his unsteady gait.

53. At that time, Erickson knew of Mr. Locke's recent fall.

54. Erickson reviewed Mr. Locke's chart and saw that he had a history of chronic disequilibrium. She also would have seen that he had a history of falls, alcohol use disorder, and subdural hematomas. She also saw that Mr. Locke had a CT scan that showed subdural hematomas in his brain on February 17 and 21, and that he had not been receiving his medication. Erickson did not document the

8

recent hematomas in his chart entry nor did he develop a treatment for Mr. Locke.

55. Erickson's assessment of Mr. Locke, especially given her knowledge of his medical history, was deficient and deliberately indifferent to his serious medical needs.

56. All of Mr. Locke's providers, including Dr. Shulte and John Does 1-5, knew that Mr. Locke had not been receiving his medications had a history of falls, alcohol use disorder, and subdural hematomas. They also knew that Mr. Locke had a CT scan that showed subdural hematomas in his brain on February 17 and 21, and that he had not been receiving his medication.

57. Erickson knew that Mr. Locke's unsteady gait and disequilibrium constituted a serious medical need, especially since he was 70 years old, had a history of falling, had been on detox protocol, had recently fallen, had not been consistently taking his medication, and had a history of several health conditions, including chronic hematomas.

58. Any reasonable medical provider aware of this history would have sent him to the hospital.

59. Erickson knew that Mr. Locke had symptoms reflective of a serious neurologic condition.

60. Upon information and belief, Mr. Locke had other NaphCare medical providers, John Does 1-5, who knew that he had an unsteady gait and disequilibrium that constituted a serious medical need, especially since he was

70 years old, had a history of falling, had been on detox protocol, and had not been consistently taking his medication, and had a history of several health conditions, including chronic hematomas.

61. None of Mr. Locke's providers performed the necessary and appropriate physical exam.

62. None of Mr. Locke's medical providers documented the function of Mr. Locke's cranial nerve, eye movement exam, tongue protrusion, facial symmetry, muscle strength, stability, balance, gait, strength of extremities, coordination.

63. Any reasonable nurse practitioner would have known that a physical exam was necessary in this situation and would have taken the steps described in the previous paragraph in their physical exam. Any reasonable nurse practitioner would have known that failing to assess those things in their physical exam would have rendered the exam deficient.

64. Despite all this knowledge about Mr. Locke's serious medical need, Erickson and John Does 1-5 did nearly nothing to evaluate Mr. Locke.

65. Erickson and John Does 1-5 did not provide any treatment to Mr. Locke or facilitate his referral to a hospital or specialist.

66. Erickson's treatment plan for Mr. Locke's unsteady gait was to order more medical records and return Mr. Locke to housing. This was an unreasonable response to his serious medical need.

67. Upon information and belief, there were correctional officers and jail staff, John Does 6-10, who knew that Mr. Locke was experiencing an unsteady gait

and disequilibrium, was elderly, had a history of falls, was not receiving his medication. In short, they knew he had a serious medical need.

68. Upon information and belief, John Does 6-10 took no reasonable measures to get Mr. Locke appropriate medical care or facilitate his transport to the appropriate medical facility, such as a hospital. This was an unreasonable response to his serious medical need.

69. Mr. Locke never received another assessment, evaluation, or treatment for his unsteady gait or disequilibrium by a NaphCare employee. For the next four days, he did not even have his vitals taken. This was unreasonable in light of his serious medical need.

70. Mr. Locke was not monitored by NaphCare or correctional staff between March 18, 2024 and March 22, 2024. They did not even assess his vitals during that period.

71. On March 19, 2024, Mr. Locke did not come out for medication pass.

72. On March 22, 2024, at 2:27 p.m. Erickson entered Mr. Locke's cell and found him unresponsive, seizing, bleeding from the nose, and breathing heavily.

73. Mr. Locke was transferred to the hospital shortly thereafter.

74. Mr. Locke experienced several seizures while being transported.

75. Mr. Locke arrived at the hospital with a Glasgow Coma Scale of 11.

76. Physicians at the hospital determined that Mr. Locke's subdural hematoma had grown significantly and had a worsened midline shift.

77. Mr. Locke underwent a right parietal micro-craniotomy and evacuation with a subdural drain placement.

78. Mr. Locke developed pneumocephalus and continued to have seizures.

79. On April 18, 2024, Mr. Locke developed worsening respiratory status and was intubated for acute hypoxic respiratory failure secondary to aspiration pneumonia and septic shock.

80. On April 24, 2024, Mr. Locke passed away.

81. Mr. Locke's condition was serious enough on March 17 and 18 that he required a referral to a medical facility, such as a hospital, where he would have received consistent imaging and monitoring and timely surgical intervention when the need arose

82. Instead, Mr. Locke remained in the jail where he received no imaging, no monitoring of even his basic vital signs, no treatment, and no medical intervention.

## B. NaphCare is known to provide unconstitutional and inadequate medical care pursuant to unsafe policies and practices.

83. NaphCare identifies itself as a correctional healthcare company that "partners with city, county, state, and federal government agencies to provide innovative healthcare, technology, and administrative solutions to address complex problems with the correctional and justice systems."

84. NaphCare earns profit by winning contracts with government entities and officials (including Mobile County, Sheriff Burch, and Warden Houston) across

the country to implement and oversee the provision of medical services in correctional facilities.

85. NaphCare routinely submits extremely low bids to win contracts with municipalities for local jails.

86. In order to still be profitable in these below-market contracts, NaphCare aggressively cuts costs by hiring untrained, unlicensed correctional officers and low-level nurses, hiring fewer personnel than necessary to properly manage the jails, refusing to invest in training for their personnel, and discouraging employees from transporting inmates to clinics or hospitals, even when there is a life-threatening medical concern.

87. NaphCare maintains the following official policies and widespread practices in the facilities it services, including MCMJ:

   a. Healthcare personnel routinely fail to assess, monitor, and treat known serious medical issues, including head injuries and seizures;

   b. Healthcare personnel routinely fail to refer and transfer inmates to outside medical providers, such as hospitals, when medically necessary.

88. NaphCare not only is aware of these policies and practices but actively encourages them because they save both NaphCare and their contracting clients money.

89. The above-described policies and practices were able to exist and thrive because NaphCare was deliberately indifferent to their existence in the MCMJ and other contracting facilities.

90. The above-described policies and practices were so well-settled and pervasive that they assume the force of law. They were persistent and widespread.

91. NaphCare was aware of the foreseeable harms caused by these policies and practices but took no reasonable measures to abate that risk.

92. NaphCare enters into contracts that set out parameters regarding the medical care of inmates in their custody. These parameters are set out in the contracts because they keep people safe, but NaphCare routinely disregards these contractual obligations and makes cuts in services to save money, often resulting in tragic consequences.

93. The cuts in NaphCare's services allow them to maintain profit margins so wide that they can sustain monetary penalties related to fines, settlements, and jury verdicts without material financial consequences.

94. The unconstitutional acts that ultimately resulted in Mr. Locke's death were done in accordance with the aforementioned official policies and widespread practices.

95. These aforementioned policies and practices were the moving force behind the unconstitutional actions of agents or employees of NaphCare, Mobile County, and Mobile County Sheriff's Office which caused Mr. Locke's death.

**C. NaphCare's unconstitutional policies are demonstrably dangerous.**

96. NaphCare is and was, at all times relevant, aware that the aforementioned policies and practices foreseeably result in the deprivation of medical care to inmates in their contracting facilities and, subsequently, tragic consequences such as death or catastrophic injury.

14

97. In 2020, NaphCare provided healthcare to over 80,000 prisoners in 53 jails and prisons across the country.[1]

98. More than half the municipal jails in the United States contract with private companies to provide health care to detainees.[2]

99. Five companies make up the vast majority of the market share of private jail medical corporations: Wellpath Holdings Inc, NaphCare Inc, Corizon, PrimeCare Medical Inc, and Armor Correctional Health Services Inc.[3]

100. Of the medical providers in the preceding paragraph, NaphCare has the highest death rate. From 2016-2018, NaphCare's death rate was 20.2 deaths per 10,000 inmates.[4]

101. A public report in the Tucson Sentinel found that the 2022 per-capita deaths in the Pima County Jail, a NaphCare facility, was four times the national average.[5]

102. Montgomery County Jail in Dayton, Ohio had more jail deaths than any county in Ohio while contracting with NaphCare.

103. NaphCare has faced $3.1 million in financial penalties in Pima County Arizona for understaffing and failing to provide contractually obligated health care.[6]

104. A 2020 investigative report found that jails where NaphCare provided healthcare had the highest death rates in the nation over a three-year period.

---

[1] https://www.prisonlegalnews.org/news/2024/apr/1/naphcare-more-proof-privatized-healthcare-deals-death-and-misery-incarcerated-enhance-profits/
[2] Id.
[3] Id.
[4] Id.
[5] https://azluminaria.org/2023/08/09/jail-deaths-pima-county-docking-naphcare/
[6] https://azluminaria.org/2023/08/09/jail-deaths-pima-county-docking-naphcare/

105. NaphCare recognizes that there are medical challenges associated with incarcerated populations. NaphCare's General Counsel, Brad Cain, stated that these challenges flow from "high rates of chronic complex illnesses, drug and alcohol abuse, and mental illness." He further stated, "Unfortunately, even with top-notch health care personnel, appropriate policies and procedures and advancements in technology, and vigilant prevention efforts, not every inmate death is preventable."[7]

106. The following are examples of NaphCare's aforementioned policies and practices resulting in tragic outcomes:

### Pierce County Jail

a. In April 2025, a federal jury ordered NaphCare Inc. to pay $25 million to Javier Tapia, whose leg was amputated in 2018 after weeks of untreated blood clots while in Pierce County Jail. Despite showing clear signs of mental and physical decline — including confusion, disordered thinking, and blackened toes — Tapia was placed in a segregated cell without a physical exam, and NaphCare's medical team failed to review his chart for 10 days. The jury found NaphCare violated Tapia's constitutional right to adequate care by relying on unqualified staff, failing to monitor his health, and neglecting internal communication. The verdict includes $5 million in damages and $20 million in punitive penalties.[8]

### Spokane County Jail

b. While in Spokane County Jail, Cindy Lou Hill died from a ruptured intestine after NaphCare, the jail's medical provider, failed to give her adequate care despite clear signs of severe distress. A NaphCare nurse found Hill on the floor in the fetal position, screaming in pain, but after a brief examination, no further medical action was taken. Hill was placed in a medical cell but never sent to a hospital, and NaphCare

---

[7] https://www.prisonlegalnews.org/news/2024/apr/1/naphcare-more-proof-privatized-healthcare-deals-death-and-misery-incarcerated-enhance-profits/

[8] https://www.seattletimes.com/seattle-news/law-justice/pierce-county-jury-awards-25m-to-man-for-jail-neglect-leg-amputation/

staff did not follow up before she was found dead hours later. A jury found NaphCare primarily responsible, awarding $24 million in punitive damages for their role in her preventable death.[9]

### *Pima County Jail*

c.  NaphCare had repeatedly failed to meet court-ordered standards for inmate care in Arizona. Despite a 2023 federal injunction issued by a District Judge in Phoenix, NaphCare delayed hiring necessary medical and psychiatric staff, claiming it could not act until its contract with the state was amended. Independent court monitors reported in July 2024 that key mandates remained unmet, including having proper emergency equipment (like defibrillators and oxygen), meeting staffing levels, and providing adequate facilities for at least 200 patients. In one case, an inmate reportedly suffered from untreated parasitic infections in his eyes and skin for over two years without seeing a specialist.

d.  In 2023, 15 people in Pima County Jail, a NaphCare facility, died in custody or shortly after being released. In 2022, at least 23 people died in the Pima County Jail or shortly after released. These high rates of jail-related deaths led the county medical examiner to overhaul practices related to medical care at the jail.

e.  In January 2022, Sylvester Inzunza died of a fentanyl overdose inside the Pima County Jail because NaphCare failed to monitor certain critical areas in the jail despite a contractual duty to provide 24/7 coverage.[10]

f.  In October 2021, Jacob Miranda died of a fentanyl overdose in Pima County Jail because NaphCare failed to staff the jail appropriately and provide medical care.[11]

g.  In January 2022, Pedro Xavier Martinez Palacios died of a fentanyl overdose in Pima County Jail because NaphCare failed to provide medical care.[12]

h.  In August 2021, Cruz Patino, Jr., died of necrotizing pneumonia—a common symptom of drug overdose—in a NaphCare jail.[13]

---

[9] https://www.spokesman.com/stories/2022/jul/20/jury-awards-27-million-to-the-estate-of-woman-who-/

[10] https://azluminaria.org/2023/08/09/jail-deaths-pima-county-docking-naphcare/

[11] Id.

[12] Id.

[13] Id.

i.  In May 2022, Alejandro Romo died of an overdose of fentanyl and methamphetamine in a NaphCare jail that was understaffed.[14]

j.  In November 2022, NaphCare was contractually obligated to staff a substance abuse counselor at least 40 hours per week at Pima County jail. They left the position vacant. That month, Hugh Burford, who struggled with opioid addiction, killed himself in the jail. Five days later, Amin Shaheed Muhammad Ali also hanged himself. An audit later found that of the 26 people who needed medically-supervised withdrawal management in the jail that month, none received it.[15]

### Fulton County Jail

k.  Lashawn Thompson died in the mental-health unit of the Fulton County Jail in Atlanta, Georgia after NaphCare providers failed to provide him food, water, and prescribed medications. He also developed a "severe body insect infestation" that NaphCare did not treat. The mental health unit was infested with insects and hundreds of people there suffered from lice, scabies, or both. A NaphCare report reflected that every person in the unit had lice, scabies, or moth, and more than 90% of the inmates in that mental health unit in July 2023 suffered from significant malnourishment. Fulton County settled that case for $4 million.[16]

### Montgomery County Jail

l.  Between 2020 and 2023, 18 people died inside of the Montgomery County Jail (Ohio) or at a hospital after transfer therefrom. Seven died in 2023 alone. The Montgomery County Jail contracts with Naphcare.[17]

m.  In January 2023, Aaron Dixon suffered a serious head injury and laceration to his forehead at the Montgomery County Jail less than eight hours before he was found unresponsive. Mr. Dixon used of the facility's emergency button, had a visible laceration on his forehead, had a pool of blood in his cell, spoke with slurred speech, and suffered seizures. Naphcare employees had knowledge of his head injury but did not monitor him, and Mr. Dixon died of complications related to his head injury.[18]

---

[14] Id.
[15] Id.
[16] https://www.prisonlegalnews.org/news/2024/apr/1/naphcare-more-proof-privatized-healthcare-deals-death-and-misery-incarcerated-enhance-profits/
[17] *Trammell v. Montgomery County*, 3:25-cv-00086-MJN-CHG, Southern District of Ohio
[18] Id.

n. In January 2023, Steve Blackshear told NaphCare employees at the Montgomery County Jail that he needed to go to the hospital while he was suffering from drug withdrawal. An officer also requested medical attention for Mr. Blackshear, but no medical staff arrived. Mr. Blackshear was found dead in his cell with fecal matter on the wall, floor, and his clothing, and vomit on the lower bunk.[19]

o. In February 2023, Amber Goonan was placed in general population of the Montgomery County Jail and not monitored, despite NaphCare's knowledge that she had serious medical needs and had been treated for an overdose earlier that day. She died after NaphCare failed to check on her for eight hours.[20]

p. Isaiah Trammell, an autistic 19-year-old, explained to a NaphCare mental health professional that he was banging his head against the wall because it was "his only way" to "get rid of the crazy in [his] head." He was placed on suicide watch, where he continued to bang his head. He never received medical assistance, but was placed in a restraint chair. He was never evaluated for a head injury. He was released from the restraint chair and continued to beat his head against the wall. Mr. Trammell told NaphCare personnel he planned to kill himself by banging his head onto the cell door and walls. Shortly after a NaphCare employee joked, "can we put him down?" Mr. Trammell killed himself by running from the back of his cell toward his door and striking his head on it, then striking it multiple times again and eventually falling to the hard concrete floor.[21]

q. In April 2023, Amanda Campell disclosed her recent hospital treatment for chest pains, history of heart problems, and recent use of methamphetamines, opioids, and alcohol. Over the next two days, NaphCare staff would only check on her three times, the last time finding her dead and "blue in the face."[22]

### Kings County Jail

r. NaphCare entered into a settlement in January 2024 to resolve the case of Gregory Cantu, who died in a NaphCare facility in Kings County California. While in custody, Mr. Cantu was wheelchair-bound and necessitated seizure medication. He and his parents requested the medication multiple times during his stay in the jail. Six weeks after

---

[19] Id.
[20] Id.
[21] Id.
[22] Id.

being booked, he was found dead from a fatal seizure on April 19, 2019.[23]

### Suffolk County House of Corrections

s.  Roderick Pendleton died of an untreated bowel obstruction in the Suffolk County House of Corrections in Boston, Massachusetts. He was not transported to the hospital despite his condition being a surgical emergency. NaphCare did not transfer him because, at least in part, the contract with Suffolk County explicitly capped hospital visits at 80 people per month, imposing a fine for excess hospital referrals.[24]

### Washoe County Jail

t.  Keely Darmody was placed on NaphCare's detox protocol after being admitted to the Washoe County Jail in Nevada while withdrawing from her drug addiction. She was found unresponsive on her cell floor with a garbage can full of vomit next to her. She was found to have died of methamphetamine toxicity, as she had inexplicably obtained the drug in the jail and was able to overdose on it without ever being treated by NaphCare personnel or sent to a hospital.

u.  Richie West was enrolled in Washoe County's detoxification program and was prescribed methadone by a NaphCare doctor without a specialization in addiction or pain management. He overdosed on the methadone but was revived by two doses of Narcan.

### Arizona State Prisons

v.  A federal court imposed $2.5 million in fines between 2009 and 2024 the "fundamentally lacking" healthcare in Arizona state prisons, which contracted with NaphCare.

### Onondaga County Jail

w.  Angela Peng died by suicide at the Onondaga County Jail, a NaphCare facility. After investigation, the New York State Commission of Correction found that Ms. Peng received substandard medical care as she suffered with symptoms of drug withdrawal.[25]

---

[23] https://www.prisonlegalnews.org/news/2024/apr/1/naphcare-more-proof-privatized-healthcare-deals-death-and-misery-incarcerated-enhance-profits/

[24] https://www.wbur.org/news/2020/03/24/jail-health-companies-profit-sheriffs-watch

[25] https://centralcurrent.org/onondaga-county-gets-different-health-care-provider-after-report-finds-serious-issues/

      x.  A woman gave birth to an infant at Onondaga County Jail. Even though the mother had been in distress for at least two days before the birth, she was not taken to the hospital in a reasonable amount of time, and the infant died shortly after being born.[26]

107. NaphCare knew about the critical incidents described in the preceding paragraph, which were a matter of public knowledge via public court filings and news media coverage.

108. Many of the critical incidents described in Paragraph 106 have resulted in lawsuits. Some have resulted in jury verdicts against NaphCare.

109. As shown by these critical incidents, there are many occasions preceding Mr. Locke's death where NaphCare's policies and practices contributed to and/or exacerbated in inmate's medical condition.

110. These critical incidents put NaphCare on notice of their unconstitutional conduct and the foreseeable consequences.

**D. NaphCare's unconstitutional policies and practices are driven by profit motive.**

111. NaphCare continues to implement the foregoing unconstitutional conditions, policies, and practices at their jails, despite their knowledge of the safety risk posed to inmates, primarily or entirely because it is profitable to do so.

112. NaphCare's primary focus is increasing revenue and procuring contracts with correctional facilities and governments, not providing medical care.

113. In 2020, NaphCare's estimated annual revenue was $483 million.[27]

---

[26] http://centralcurrent.org/onondaga-county-gets-different-health-care-provider-after-report-finds-serious-issues/

[27] https://www.prisonlegalnews.org/news/2024/apr/1/naphcare-more-proof-privatized-healthcare-deals-death-and-misery-incarcerated-enhance-profits/

114. NaphCare and the contracting county save money by choosing to keep inmates in jail rather than send them to the hospital.

115. The counties that NaphCare contracts with typically bear the cost associated with an inmate's transport, treatment, and stay at an outside hospital.

116. If NaphCare sends fewer inmates to the hospital, it lowers the cost to the contracting county.

117. NaphCare is thus incentivized to limit the number of referrals and transports to outside medical facilities to keep costs low and retain lucrative contracts like the one it has with Mobile County and Sheriff Burch.

118. NaphCare routinely delays or defers referral of inmates to the hospital with the intent of saving money.

119. NaphCare routinely enters into contracts with counties that explicitly or implicitly disincentivize hospital referrals.

120. A Mobile County Commissioner explicitly stated in a 2020 Board meeting, during a discussion about the renewal of a NaphCare contract, that "the hospitals are where the real problems are at and where the real cost is coming in."

121. Pursuant to its contract with Essex County in Massachusetts, NaphCare received monthly bonuses if it ordered no more than fifteen emergency ambulance trips.[28]

---

[28] https://www.prisonlegalnews.org/news/2024/apr/1/naphcare-more-proof-privatized-healthcare-deals-death-and-misery-incarcerated-enhance-profits/

122. Eileen Taylor, a former physician assistant at the Essex County Jail, was told by her NaphCare supervisors, "Don't send them out [to see outside physicians] unless you absolutely, positively have to."[29]

123. Pursuant to its contract with Suffolk County in Massachusetts, NaphCare kept hospital visits below eighty per month. A fine was imposed if it exceeded that number.[30]

124. NaphCare is also incentivized to cut costs by eliminating or reducing medical services.

125. Facilities utilizing NaphCare services are chronically understaffed.

126. NaphCare increases revenue by approximately 30% by choosing to hire Licensed Practical Nurses instead of Registered Nurses, because the wages. LPNs only receive 12-18 months of training, compared to RNs receiving 2-4 years, to earn their respective licenses. LPNs maintain a much more limited scope of practice and are supposed to operate under the supervision of RNs. NaphCare LPNs routinely act beyond their limited scope of practice.

127. NaphCare routinely relies on correctional officers, who have no training or little training in medical care, to monitor detainees with serious medical issues who require medical monitoring.

128. Arizona has withheld more than $10 million from NaphCare due its understaffing of the state's prisons.

---

[29] https://www.prisonlegalnews.org/news/2024/apr/1/naphcare-more-proof-privatized-healthcare-deals-death-and-misery-incarcerated-enhance-profits/
[30] https://www.prisonlegalnews.org/news/2024/apr/1/naphcare-more-proof-privatized-healthcare-deals-death-and-misery-incarcerated-enhance-profits/

### E. Mobile County and Sheriff Paul Burch breached their non-delegable duty to provide inmates with adequate medical care.

129. Mobile County and Sheriff Burch knew about the critical incidents described in Paragraph 106, which were a matter of public knowledge via public court filings and news media coverage.

130. Mobile County and Sheriff Burch had a non-delegable duty to provide medical care for prisoners at the Mobile County Metro Jail (MCMJ).

131. Sheriff Burch was elected Sheriff in January 2023.

132. As Mobile County Sheriff, Burch is responsible for the operation, administration, and maintenance of MCMJ and the well-being of those employed and incarcerated there.

133. Shortly after being elected, Sheriff Burch eliminated the Warden position from a "merit system," making it so that the Sheriff could appoint "those that you feel is going to have your best interest."

### i. Mobile County and Sheriff Burch are aware of the many problems and dangers that exist in the Mobile County Metro Jail.

134. NaphCare was the sole provider of inmate healthcare services at MCMJ at the time of Robert Locke's death.

135. NaphCare has been the sole provider of inmate healthcare services at MCMJ since 2013.

136. MCMJ holds approximately 1,500 detainees in custody.

137. MCMJ maintains a staff of approximately 600 people.

138. MCMJ is the largest jail in the state of Alabama.

139. MCMJ houses detainees and inmates from other counties.

140. Mobile County Metro Jail has a history of inmates dying in custody.

    a. On June 11, 2015, Brandon Jeffries was aggressively assaulted and battered by guards at MCMJ. After the beating, he did not receive medical care from NaphCare staff. When he finally went to the hospital, he had multiple spinal fractures was permanently paralyzed.

    b. On June 26, 2023, Ernest James Little, Jr. was found unresponsive by cellmates and pronounced dead on arrival to the hospital.

    c. On July 15, 2023, Terrell Markuise Moultrie was found unresponsive in his cell and soon after pronounced dead. He is believed to have died from an opioid overdose, which is treatable if addressed quickly enough.

    d. On July 25, 2023, William Gerard Appling, Jr. died in a medical cell of the jail. Mr. Appling had arrived at MCMJ with serious injuries. Instead of being sent to the hospital, he stayed in MCMJ's medical clinic, alone in a cell. He succumbed to his injuries three days later.

    e. On August 15, 2023, William Gregory Hooper was found unresponsive in his cell and pronounced dead.

    f. On December 14, 2023, William Franklin was found unresponsive in his cell and declared dead by paramedics soon after.

    g. On June 26, 2024, Elvin Craig Stacy was found unresponsive in his cell and later pronounced dead in the hospital. He had been complaining of chest pains and heart failure, resulting in him being held in a medical cell but not sent to the hospital.

    h. In September of 2024, an inmate who had been sent to the hospital awoke to an MCMJ corrections officer, who was charged with supervising the inmate at the hospital, raping him.

141. Mobile County and Sheriff Burch continued to make deliberate decisions to approve NaphCare payments and implement their operation in MCMJ.

142. After Mr. Little, Jr., Mr. Moultrie, and Mr. Appling, Jr. died, Sheriff Paul Burch publicly addressed the death of three detainees in less than on month by stating, the following:

    a. "The jail is the biggest liability within the Sheriff's Office."

    b. "The high number of deaths was likely coincidental."

    c. "There was nothing done improperly, nothing that we could have changed that would have changed the outcomes of any of them."

    d. "Certainly being short-staffed, if you had more people to do more frequent checks, but that's really unrealistic at this point. They're [jail staff] doing the best they can with what they got. I can't think of anything that we could do, or could have done, that would have changed the outcome."

    e. At least two of the deaths in July of 2023 were believed to be "medical related."

    f. "We're over capacity, I don't see any immediate relief."

143. Mobile County adopted and ratified the unconstitutional and negligent policies, practices, and conditions implemented by NaphCare at NaphCare Correctional Center.

144. It was foreseeable that NaphCare's unconstitutional policies, practices, and conditions would jeopardize the safety of Mobile County detainees housed at NaphCare jails.

145. Mobile County continues to pay NaphCare millions of dollars to provide medical care to the County's detainees.

146. The County and Sheriff Burch had a legal duty to monitor Defendant NaphCare's performance pursuant to the parties' contract.

147. The County Defendants were aware of the unconstitutional medical care NaphCare routinely provided, as described *supra*, and failed take reasonable measures to address the deficiencies in NaphCare's performance and practice of constitutional medical care.

148. Like many NaphCare facilities, MCMJ is chronically understaffed in terms of medical personnel.

149. Sheriff Burch addresses the understaffing problems by increasing overtime hours for staff.

150. Sheriff Burch understaffed the jail and/or failed to address NaphCare's chronic understaffing of the jail.

151. Mobile County and Sheriff Burch failed to train and supervise the jail staff about the needs of pretrial detainees with medical conditions, including substance abuse disorders and chronic subdural hematomas.

152. Although Defendants Mobile County and Sheriff Burch sought to privatize the provision of medical care in their jail by delegating final policy-making authority to NaphCare, they cannot contract-away their constitutional obligations, and they are liable for any of NaphCare's unconstitutional corporate customs or policies that resulted in harm to any of their detainees and prisoners confined in MCMJ.

153. Mobile County Sheriff Burch were deliberately indifferent to the known risks of serious harm to prisoners such as Mr. Locke.

   ii.   ***Mobile County and Sheriff Burch continue to fund and maintain the contracts with NaphCare, despite the evident risks.***

154. The County Defendants maintained a contract with NaphCare at all times relevant.

155. Mobile County and Sheriff Burch were on notice that NaphCare had a policy of providing inadequate medical care, as described in this complaint.

27

156. Mobile County and Sheriff Burch were on notice that many people had died of preventable and treatable medical conditions in facilities that contracted with NaphCare.

157. Mobile County and Sheriff Burch were on notice that many people died in MCMJ of preventable and treatable medical conditions while NaphCare was responsible for medical care within the MCMJ.

158. The County Defendants were aware of the aforementioned policies and practices pursuant to which NaphCare provides inadequate medical care to detainees.

159. Despite this notice, Mobile County continued to contract with NaphCare to provide medical care to Mobile County detainees.

160. Mobile County bears and must approve costs associated with MCMJ inmate healthcare, an expensive facet of which is their treatment in outside facilities such as hospitals.

161. Mobile County, through its Board of Commissioners, votes on a monthly basis to approve payment of NaphCare claims and payrolls.

*2019*

162. Mobile County approved payments totaling $8,778,162.98 to NaphCare for the year 2019.

163. In 2019, the County apportioned $15,000,000 to update the jail. An unknown portion of that money was intended to go to updating the jail's medical unit. This did not result in the hiring of a full-time physician, hiring a specialist in

addiction or pain medicine, or building a functional emergency department that could replace the jail's need to transport inmates to a hospital when suffering medical emergencies.

*2020*

164. Mobile County approved payments totaling $8,058,585.97 to NaphCare for the year 2020.

165. On April 28, 2020, the County Commissioners considered whether to approve a Health Services Agreement renewal among Mobile County, Sheriff Burch, and NaphCare. This 2020 Agreement provide a renewal of NaphCare's contract to provide health services at MCMJ between August 1, 2020, and July 31, 2021.

166. In its consideration of the 2020 Agreement renewal, the County, by and through its Commissioners, expressed concern that the County was spending too much money on hospital bills when inmates were transferred to an outside hospital.

167. Mobile Infirmary, one of the hospitals that MCMJ refers its inmates to, charges the County 82% of all bill charges from MCMJ inmates. Another hospital, Springhill Hospital, previously charged the County 130% of all bill charges from MCMJ inmates, before it began refusing MCMJ inmates. The University of South Alabama charges the County $2,808.00 per diem per patient plus other costs.

168. The County considered these rates too high based on national averages and sought to reduce them.

29

169. For the County, inmates to the hospital in the most expensive element of inmate healthcare. The President of the County's Board of Commissioners stated, "The hospitals are where the real problems are at and where the real cost is coming in."

170. The President of the County Commission encouraged the construction of "a couple of hospital rooms onto Metro Jail." He further stated, "If you have somebody who is in a severe situation such as a heart attack or something life-threatening, to not transfer them will save you about two thousand dollars ($2,000.00) per day."

> **President Carl:** No, not at all. The medicines we were talking about are roughly, without giving any prices, about sixty dollars ($60.00) per tablet, to give you some idea. We are spending about seven hundred thousand dollars ($700,000.00) just on medication alone. By following through and getting this code, we can probably take somewhere around twenty percent (20%) off our medication cost. The hospitals are where the real problems are at and where the real cost is coming in. I know I am a short-timer and I am going to be out of here, but I would really encourage y'all, and I have not talked to Sam Cochran, Mobile County Sheriff, but to build a couple of hospital rooms onto Metro Jail would fix a lot of problems. If you have somebody who is in a severe situation such as a heart attack or something life-threatening, to not transfer them will save you about two thousand dollars ($2,000.00) per day.

171. Shortly after that statement, another County Commissioner noted that there is no physician on the premises of the MCMJ. In reference to the payment of professional medical services at the jail, that County Commissioner stated, "We definitely need to look and see if there is a less expensive way of approaching it with all options on the table."

30

172. The County noted that one of the reasons it is so expensive for the County to send people to the hospital is because they have to provide around-the-clock security for each individual housed at the hospital.

173. The County also noted that 27% of inmates at MCMJ received some sort of hospital treatment, and 3% of those inmates who were hospitalized yielded costs that exceeded $100,000.

174. The significant cost of medical care for MCMJ inmates appeared to surprise the County Commissioners.

175. The President of the County Commissioner implored, "We just have to start chipping away at it and start picking it apart instead of trying to block it together. It is the easiest way. I think it can be done if we want to bring it down."

176. A former employee at MCMJ spoke to the County at a Board of Commissioners meeting on June 22, 2020, at which time he informed them that MCMJ does not take training very seriously and that "[w]hen it came to the conditions of Metro Jail, those were very poor standards."

177. In the years that followed the County's April 2020 meeting, the County approved considerably fewer payments to NaphCare, despite significant increases in population.

*2021*

178. Mobile County approved payments totaling $6,489,047.98 to NaphCare for the year 2021, a significant decrease from the previous two years after the County

had expressed an explicit intent to reduce healthcare costs by limiting inmate hospital referrals.

179. On March 22, 2021, Mobile County, by and through its Board of Commissioners, unanimously voted to approve the Health Services Agreement renewal among Mobile County, Sheriff Burch, and NaphCare. This Agreement provide a renewal of NaphCare's contract to provide health services at MCMJ between August 1, 2021, and July 31, 2022.

*2022*

180. Mobile County approved payment of $6,681,812.38 to NaphCare for the year 2022.

181. On June 13, 2022, Mobile County, by and through its Board of Commissioners, unanimously voted to award NaphCare with a new contract for the Mobile County Metro Jail Inmate Healthcare Services as the lowest responsible bidder, for the period August 1, 2022, through July 31, 2025, with the option for a two-year extension.

*2023*

182. Mobile County approved payments totaling $7,685,715.42 to NaphCare for the year 2023.

\* \* \*

183. Mobile County could follow the footsteps of other jails[31] that have publicly

ended or paused NaphCare's services upon realization of their deficient

practices:

> a. After an Alcohol, Drug Addiction and Mental Health Services
> (ADAMHS) board member voiced concerns about the level of care
> NaphCare provides at the Montgomery County (Ohio) Jail, the County
> tabled a nearly $1 million fund transfer to NaphCare.

> b. The Sheriff of San Diego replaced NaphCare with another correctional
> medicine contractor after NaphCare repeatedly violated contract
> terms, failed to pay outside health providers which left the Sheriff's
> Department unable to transport patients to certain facilities,
> understaffed facilities, relied on unlicensed personnel, failed to file
> required reports, and failed to repair or replace medical equipment.

> c. After three jail deaths in 15 months, Onondaga County replaced
> NaphCare with Wellpath. Termination of the contract came shortly
> after Onondaga County Legislature Chair Jim Rowley sent a letter to
> the New York State Commission of Correction urging them to
> investigate NaphCare's ability to provide healthcare at the jail, citing
> NaphCare's "prior track record" at other facilities.[32]

184. Sheriff Burch oversees the implementation of the NaphCare contract at

MCMJ, while Mobile County continues to approve the contract's funding. Both

are responsible for the foreseeable consequences of that contract.

---

[31] https://cochs.org/articles-naphcare-2024/
[32] https://centralcurrent.org/onondaga-county-gets-different-health-care-provider-after-report-finds-serious-issues/

## CAUSES OF ACTION

I.  **Section 1983 – Violations of the Fourteenth Amendment to the U.S. Constitution**

A.  **Plaintiff v. Mobile County, Sheriff Paul Burch in his official capacity, NaphCare USA, Inc., NaphCare, Inc. (*Monell*)**

185. Plaintiffs incorporate Paragraphs 1-184 as if fully restated here.

186. An official policy or custom existed pursuant to which NaphCare Correctional Center L.L.C., NaphCare Corrections, L.L.C., NaphCare Management Company, L.L.C., Mobile County, and Sheriff Ed Burch in his Official Capacity (the "*Monell* Defendants") provided inadequate medical care to detainees in the custody of Mobile County that are housed in NaphCare facilities, including the Olla LCC.

187. NaphCare maintains the following official policies and widespread practices in the facilities it services, including MCMJ:

   a. Healthcare personnel routinely fail to assess, monitor, and treat known serious medical issues, including head injuries and seizures;

   b. Healthcare personnel routinely fail to refer and transfer inmates to outside medical providers, such as hospitals, when medically necessary.

188. Mobile County adopted and ratified the unconstitutional and negligent policies, practices, and conditions implemented by NaphCare at NaphCare Correctional Center.

189. It was foreseeable that NaphCare's unconstitutional policies, practices, and conditions would jeopardize the safety of Mobile County detainees housed at NaphCare jails.

190. Mobile County continued to renew the contract with NaphCare, even when it was evident that they were providing medical care below constitutionally minimal standards.

191. Policymakers for the *Monell* Defendants knew or should have known about the unconstitutional and dangerous policies and customs described in this Complaint.

192. Said policymakers were deliberately indifferent to said policies and customs.

193. Said policies and customs were undertaken with deliberate indifference for the rights and safety of others, including Mr. Locke.

194. Said policies and customs were the driving force behind the failure to provide adequate medical care to Mr. Locke, leading to his suffering and death, and caused a violation of his rights.

195. The *Monell* Defendants are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law and Louisiana law.

## B. All Plaintiffs v. Sheriff Paul Burch in his individual capacity (Supervisory Liability)

196. Plaintiffs incorporate Paragraphs 1-184 as if fully restated here.

197. One or more subordinates of Sheriff Burch in his individual capacity violated Mr. Locke's rights.

198. Sheriff Burch adopted policies that encouraged or were indifferent to the provision of inadequate medical care within NaphCare facilities, including the MCMJ.

199. Sheriff Burch's foregoing policies caused Mr. Locke's suffering and death, and the violation of Plaintiffs' rights under federal law and Alabama law.

200. Sheriff Burch adopted the foregoing policies with deliberate indifference.

201. Said policies and customs were undertaken in wanton disregard for the rights and safety of others, including Mr. Anderson.

202. Said policies and customs were a driving force behind the failure to provide adequate medical care to Mr. Locke, leading to his suffering and death, and caused a violation of Mr. Locke's rights.

203. Sheriff Burch is liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law and Alabama law.

### C. Plaintiff v. Katie Erickson, John Does 1-10 (Deliberate Indifference to a Serious Medical Need)

204. Plaintiffs incorporate Paragraphs 1-184 as if fully restated here.

205. Mr. Locke was exposed to a substantial risk of serious harm.

206. Katie Erickson and the John Doe Defendants showed deliberate indifference to Mr. Locke's serious medical need.

207. The deliberate indifference of these defendants harmed Mr. Locke, causing his suffering and death.

208. Said indifference was undertaken with deliberate indifference for Mr. Locke's rights.

209. Said indifference harmed Mr. Locke, leading to his suffering and death, and caused a violation of his rights.

210. These defendants are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law and Louisiana law.

## II.     Negligence

### A.  Plaintiff v. NaphCare USA, Inc., NaphCare, Inc.

211. Plaintiffs incorporate Paragraphs 1-184 as if fully restated here.

212. Plaintiff alleges that NaphCare negligently departed from the accepted standard of care applicable to similarly situated healthcare providers which was in effect at the time in one or more of the following respects:

   a.  Negligently failing to safely and timely transport Mr. Locke to a medical facility capable of treating him;

   b.  Negligently failing to adequately implement fall-risk precautions and protections for the benefit of Mr. Locke;

   c.  Negligently failing to protect Mr. Locke from fall-related injuries despite knowing him to be at risk of such injuries;

   d.  Negligently failing to provide fall-prevention safety precautions in the treatment and care of Mr. Locke;

   e.  Negligently failing to perform a neurological exam of Mr. Locke;

   f.  Negligently failing to perform a physical assessment of Mr. Locke;

   g.  Negligently failing to ensure that Mr. Locke was assessed by a physician or specialist;

   h.  Negligently failing to train, educate, and make NaphCare, Mobile County, and/or Mobile County Sheriff's staff aware of fall-risk precautions, protocols related to detainees showing signs of a neurological condition, and how to appropriately identify and respond to a medical emergency;

   i.  Negligently failing to train, educate, and make the NaphCare, Mobile County, and/or Mobile County Sheriff's staff aware of the protective measures that should be taken to ensure the safety of a detainee who is a fall risk, is showing signs of a neurological condition, and/or experiencing a medical emergency;

    j.   Negligently failing to formulate and/or implement policies, procedures, and/or protocols to ensure the of a detainee who is a fall risk, is showing signs of a neurological condition, and/or experiencing a medical emergency;

    k.   Negligently failing to formulate, adopt, implement and/or follow policies, procedures, and protocols for the treatment and care of of a detainee who is a fall risk, is showing signs of a neurological condition, and/or experiencing a medical emergency;

    l.   Negligently failing to take any other reasonable steps to provide Mr. Locke with adequate medical care for his condition.

213. As a proximate consequence of the above-described negligent conduct of the Defendants, Mr. Locke was caused to suffer profound traumatic injuries and a wrongful death.

**B. Plaintiff v. the agents and employees of NaphCare USA, Inc., NaphCare, Inc**

214. Plaintiffs incorporate Paragraphs 1-184 as if fully restated here.

215. Plaintiff alleges that NaphCare's agents and employees negligently departed from the accepted standard of care applicable to similarly situated healthcare providers which was in effect at the time in one or more of the following respects:

    a.   Negligently failing to safely and timely transport Mr. Locke to a medical facility capable of treating him;

    b.   Negligently failing to adequately implement fall-risk precautions and protections for the benefit of Mr. Locke;

    c.   Negligently failing to protect Mr. Locke from fall-related injuries despite knowing him to be at risk of such injuries;

    d.   Negligently failing to provide fall-prevention safety precautions in the treatment and care of Mr. Locke;

    e.   Negligently failing to perform a neurological exam of Mr. Locke;

    f.   Negligently failing to perform a physical assessment of Mr. Locke;

    g.   Negligently failing to ensure that Mr. Locke was assessed by a physician or specialist;

    h.   Negligently failing to take any other reasonable steps to provide Mr. Locke with adequate medical care for his condition.

216. As a proximate consequence of the above-described negligent conduct of the Defendants, Mr. Locke was caused to suffer profound traumatic injuries and a wrongful death.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, damages, attorneys' fees, disbursement, and any other and further relief as this Court deems just and equitable.

/s/ Aaron Maples

_____

Aaron Maples
Maples, Connick & Brendel, LLC
411 St. Francis St., STE B
Mobile, Alabama 36602
Tel: (3251) 249-7953
Fax: (504) 269-3759
Email: aaron@maplesconnick.com

And

/s/ Sam Harton

_____

Romanucci and Blandin, LLC
Sam Harton (*pro hac vice* pending)

321 N. Clark St.
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: sharton@rblaw.net