**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| TRACY MURRILL, As Personal Representative of Robert Vincent Locke, deceased, | ) ) ) | |
| | ) | **CIVIL ACTION NO.:** |
| Plaintiff, | ) | **1:26-cv-00017-KD-N** |
| | ) | |
| v. | ) | |
| | ) | |
| SHERIFF PAUL BURCH, et al; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S OMNIBUS RESPONSE TO DEFENDANTS NAPHCARE, INC. AND ERICKSON'S MOTIONS TO DISMISS**

On February 23, 2024, Robert Vincent Locke was admitted to the Mobile County Metro Jail (MCMJ) with bilateral subdural hematomas, a recent middle-meningeal-artery embolization, severe alcohol use disorder requiring detoxification, chronic disequilibrium, and a documented fall risk. Doc. 1, ¶¶ 21-32. Over the next four weeks, Mr. Locke refused medication at least thirteen times, was never placed on the detoxification protocol Nurse Ingram had identified at intake, and reported new falls in his cell. *Id.* ¶¶ 33-49. On March 18, 2024, after Mr. Locke reported repeated falls in his cell, Nurse Practitioner Katie Erickson examined Mr. Locke, declined to document his hematomas, performed no neurological assessment, developed no treatment plan, and did not refer him to a hospital. *Id.* ¶¶ 50-66. Four days later, Mr. Locke was found unresponsive and seizing on the floor of his cell. *Id.* ¶¶ 71-72. He died on April 24, 2024. *Id.* ¶¶ 79-80. MCMJ contracts with a private health care, referred to as NaphCare in Plaintiff's Complaint. Doc. 1 at ¶¶ 17, 159. NaphCare is comprised of an apparently complex web of corporate affiliates and subsidiaries, and the allegations against NaphCare in Plaintiff's

1

Complaint, as well as the discussion of NaphCare in this motion, extend to all NaphCare's parents, subsidiaries, and affiliates. *Id.*; *See also* Doc. 34-1 at ¶¶ 17.

Tracy Murrill, Mr. Locke's personal representative ("Plaintiff"), brought suit against NaphCare, Erickson, Mobile County, and Sheriff Paul Burch alleging that Mr. Locke received substandard and constitutionally inadequate care at MCMJ. Defendants NaphCare and Erickson now ask this Court to dismiss Plaintiff's Complaint at the pleading stage. None of NaphCare and Erickson's arguments have merit.  The Court should deny their motions.

## FACTUAL BACKGROUND

I.  **Mr. Locke entered the Mobile County Metro Jail with multiple serious medical conditions that were well known to NaphCare and jail staff.**

Robert Vincent Locke was a 70-year-old man with a documented history of chronic disequilibrium, subdural hematomas, and falls resulting in head injuries. Doc. 1, ¶ 2; see also *Id.* ¶ 57. He had been booked at the Mobile County Metro Jail (MCMJ) multiple times before, and both MCMJ and NaphCare personnel were aware he suffered from Alcohol Use Disorder, a chronic, serious medical condition. *Id.* ¶¶ 22-23.

Mr. Locke's most recent admission to MCMJ followed a hospitalization. After being released from MCMJ on February 16 or 17, 2024, he was admitted to the University of South Alabama Hospital (USAH) on February 17 as a trauma transfer for management of bilateral subdural hematoma in the context of multiple falls. Doc. 1, ¶¶ 21, 25. CT scans showed two subacute chronic subdural hematomas in his brain, a midline shift, moderate cerebral atrophy, chronic small vessel ischemic disease, and severe degenerative changes in some of his vertebrae. *Id.* ¶ 26. On February 19, he underwent an MMA embolization, a minimally invasive procedure to treat chronic subdural hematomas. *Id.* ¶ 27. A follow-up CT scan on February 21 confirmed his hematomas remained but were stable. *Id.* ¶ 29.

2

On February 23, 2024, Mr. Locke was readmitted to MCMJ. *Id.* ¶ 30. NaphCare Nurse Angela Ingram conducted an initial screening and physical assessment and determined that Mr. Locke needed: placement in administrative segregation to monitor his medical issues; placement on a low tier bunk because he was a known fall risk; placement on "detox watch"; a treatment plan for alcohol withdrawal; and a prescription for Keppra twice a day for two weeks for seizure prophylaxis. *Id.* ¶ 31. As alleged, these directives indicate that NaphCare and correctional staff were aware of their responsibility to treat and monitor Mr. Locke's Alcohol Use Disorder, chronic disequilibrium, serious neurological condition, and fall risk. *Id.* ¶ 32. On February 26, NaphCare and MCMJ received a fax of Mr. Locke's medical records from USAH, including Mr. Locke's most recent CT scan reports reflecting his subdural hematomas. *Id.* ¶ 35.

II. **Despite their knowledge of his serious medical needs and worsening condition, Erickson and other NaphCare providers failed to examine, treat, or transfer Mr. Locke.**

Although Nurse Ingram had identified the need for a detox protocol and seizure prophylaxis, Mr. Locke was not actually placed on any detoxification protocol or medication-assisted treatment for his alcohol use disorder pursuant to the policies and practices of NaphCare and Mobile County. Doc. 1, ¶ 33. Mr. Locke missed or refused medication pass at least thirteen times in the four weeks that followed: February 24, 26, 28 (also refusing a blood pressure check), and 29; and March 3 (after Correctional Officer Henderson called for him three times), 4, 5, 6 (refusing all medication and a blood pressure check), 8, 9, 13, 15, 17, and 19. *Id.* ¶¶ 34, 36-44, 47-49, 71. As alleged, Mr. Locke's repeated refusal to take his medication would have indicated to all NaphCare and correctional staff that his medical condition was deteriorating and that he was vulnerable to a critical incident. *Id.* ¶ 45.

On March 11, 2024, NaphCare physician Dr. William Schulte examined Mr. Locke and reviewed his chart, which showed that Mr. Locke had a CT scan that showed subdural

3

hematomas in his brain on February 17 and 21, and that he had not been coming out for medication pass. *Id.* ¶ 46. Despite reviewing this information, Dr. Schulte did not document the recent hematomas in his chart entry nor did he develop a treatment plan for Mr. Locke. *Id.*

On March 18, 2024, at 4:14 p.m., Mr. Locke reported to Sheila Caulton, a NaphCare Licensed Practical Nurse, that he had fallen in his cell several times that day. *Id.* ¶ 50. Caulton noted that Mr. Locke had an unsteady gait and a history of not complying with his medications, and referred him to "clinic." *Id.* ¶ 51. At 4:44 p.m. that same day, Defendant Katie Erickson, a NaphCare Nurse Practitioner, saw Mr. Locke in the clinic to assess him. *Id.* ¶ 52. At that time, Erickson knew of Mr. Locke's recent fall. *Id.* ¶ 53.

Erickson reviewed Mr. Locke's chart and saw that he had a history of chronic disequilibrium. *Id.* ¶ 54. The chart further reflected his history of falls, alcohol use disorder, and subdural hematomas, that he had a CT scan that showed subdural hematomas in his brain on February 17 and 21, and that he had not been receiving his medication. *Id.* Like Dr. Schulte before her, Erickson did not document the recent hematomas in his chart entry nor did she develop a treatment plan for Mr. Locke. *Id.* The Complaint alleges that Erickson's assessment of Mr. Locke, especially given her knowledge of his medical history, was deficient and deliberately indifferent to his serious medical needs. *Id.* ¶ 55.

The Complaint specifically pleads Erickson's subjective knowledge of Mr. Locke's serious medical condition:

> Erickson knew that Mr. Locke's unsteady gait and disequilibrium constituted a serious medical need, especially since he was 70 years old, had a history of falling, had been on detox protocol, had recently fallen, had not been consistently

> taking his medication, and had a history of several health conditions, including chronic hematomas.

*Id.* ¶ 57. Erickson also knew that Mr. Locke had symptoms reflective of a serious neurologic condition. *Id.* ¶ 59. Any reasonable medical provider aware of this history would have sent him to the hospital. *Id.* ¶ 58. Mr. Locke's other NaphCare providers—Dr. Schulte and John Does 1-5—possessed the same knowledge. *Id.* ¶¶ 56, 60.

The Complaint identifies the specific clinical failures. None of Mr. Locke's providers performed the necessary and appropriate physical exam. *Id.* ¶ 61. None of them documented the function of Mr. Locke's cranial nerve, eye movement exam, tongue protrusion, facial symmetry, muscle strength, stability, balance, gait, or strength of extremities, coordination. *Id.* ¶ 62. Any reasonable nurse practitioner would have known that a physical exam was necessary in this situation, that the listed steps were required, and that failing to assess those things in her physical exam would have rendered the exam deficient. *Id.* ¶ 63. Despite all this knowledge about Mr. Locke's serious medical need, Erickson and other NaphCare staff did nearly nothing to evaluate Mr. Locke. *Id.* ¶ 64. They did not provide any treatment to Mr. Locke or facilitate his referral to a hospital or specialist. *Id.* ¶ 65. Erickson's treatment plan was simply to order more medical records and return Mr. Locke to housing—an unreasonable response to his serious medical need. *Id.* ¶ 66. After Mr. Locke's encounter with Erickson on March 18, Mr. Locke never received another assessment, evaluation, or treatment for his unsteady gait or disequilibrium by Erickson or any other NaphCare employee. *Id.* ¶ 69. For the next four days, he did not even have his vitals taken. *Id.* ¶¶ 69-70.

**III.    Mr. Locke was found unresponsive and seizing in his cell, underwent emergency neurosurgery, and died of conditions that timely hospital transfer would have prevented.**

On March 22, 2024, at 2:27 p.m., Erickson entered Mr. Locke's cell and found him unresponsive, seizing, bleeding from the nose, and breathing heavily. Doc. 1, ¶ 72. He was transferred to the hospital but experienced several seizures while being transported. *Id.* ¶¶ 73-74. He arrived with a Glasgow Coma Scale of 11, and physicians determined that Mr. Locke's subdural hematoma had grown significantly and had a worsened midline shift. *Id.* ¶¶ 75-76. He underwent an emergent right parietal micro-craniotomy and evacuation with a subdural drain placement, but developed pneumocephalus and continued to have seizures. *Id.* ¶¶ 77-78. On April 18, 2024, his respiratory status worsened and he was intubated for acute hypoxic respiratory failure secondary to aspiration pneumonia and septic shock. *Id.* ¶ 79. On April 24, 2024, Mr. Locke died. *Id.* ¶ 80.

Mr. Locke's condition—including multiple falls in his cell following a hospitalization for subdural hematomas—was serious enough on March 17 and 18 that he required a referral to a medical facility, such as a hospital, where he would receive consistent imaging and monitoring, and timely surgical intervention. *Id.* ¶ 81. Instead, Mr. Locke remained in the jail where he received no imaging, no monitoring of even his basic vital signs, no treatment, and no medical intervention. *Id.* ¶ 82.

**IV.    NaphCare's failures were the product of pervasive, profit-motivated policies and customs of which NaphCare and Mobile County have long been on notice.**

The conduct that killed Mr. Locke was not isolated. NaphCare maintains the following official policies and widespread practices in the facilities it services, including MCMJ: (a) healthcare personnel routinely fail to assess, monitor, and treat known serious medical issues, including head injuries and seizures; and (b) healthcare personnel routinely fail to refer and

transfer inmates to outside medical providers, such as hospitals, when medically necessary. Doc. 1, ¶ 87. NaphCare actively encourages these practices because they save both NaphCare and their contracting clients money. *Id.* ¶ 88. They are so well-settled and pervasive that they assume the force of law, and they are persistent and widespread. *Id.* ¶ 90. The unconstitutional acts that ultimately resulted in Mr. Locke's death were done in accordance with these official policies and widespread practices, and those policies were the moving force behind the unconstitutional actions of agents and employees of NaphCare, Mobile County, and the Mobile County Sheriff's Office that caused Mr. Locke's death. *Id.* ¶¶ 94-95.

These policies are profit-driven. NaphCare submits extremely low bids to win contracts, then aggressively cuts costs by hiring low-level nurses, staffing fewer personnel than necessary, and discouraging employees from transporting inmates to clinics or hospitals, even when there is a life-threatening medical concern. *Id.* ¶ 86. Because the contracting county bears the cost of hospital transport, treatment, and stay, NaphCare and its government clients save money by choosing to keep inmates in jail rather than send them to the hospital. *Id.* ¶¶ 114-115. NaphCare routinely delays or defers referral of inmates to the hospital with the intent of saving money, and routinely enters into contracts with counties that explicitly or implicitly disincentivize hospital referrals. *Id.* ¶¶ 118-119. NaphCare's Essex County, Massachusetts contract paid monthly bonuses if it ordered no more than fifteen emergency ambulance trips, and its Suffolk County contract imposed fines for exceeding eighty hospital visits per month. *Id.* ¶¶ 121, 123. A former NaphCare physician assistant testified that her supervisors instructed: "Don't send them out [to see outside physicians] unless you absolutely, positively have to." *Id.* ¶ 122. NaphCare also boosts revenue by approximately 30% by hiring Licensed Practical Nurses in lieu of Registered

7

Nurses, and routinely relies on correctional officers, who have no or little training in medical care, to monitor detainees with serious medical issues. *Id.* ¶¶ 126-127.

NaphCare's policies have produced a documented pattern of preventable in-custody deaths and injuries—incidents that put NaphCare on notice of its unconstitutional conduct and the foreseeable consequences. *Id.* ¶ 110. NaphCare has the highest death rate among major correctional medicine contractors. *Id.* ¶¶ 4, 100. Prior incidents detailed in the Complaint include the $25 million federal jury verdict for Javier Tapia in Pierce County, Washington, where NaphCare placed Mr. Tapia in a segregated cell without a physical exam and failed to review his chart for ten days, resulting in the amputation of his leg from untreated blood clots, *Id.* ¶ 106(a); and Aaron Dixon in Montgomery County, Ohio, who died of complications from a head injury of which NaphCare employees had knowledge but did not monitor. *Id.* ¶ 106(m). The Complaint catalogs many additional incidents involving the same failures across NaphCare facilities nationwide. *Id.* ¶ 106(b)-(x).

The same patterns existed at MCMJ. The Complaint alleges that MCMJ has a history of inmates dying in custody from preventable causes. *Id.* ¶ 140. These include Brandon Jeffries (June 2015—beaten by guards but did not receive medical care from NaphCare staff); Terrell Markuise Moultrie (July 2023—died of a treatable opioid overdose); William Gerard Appling, Jr. (July 2023—kept alone in a cell in MCMJ's medical clinic with serious injuries rather than being sent to a hospital); and Elvin Craig Stacy (June 2024—held in a medical cell despite complaining of chest pains and heart failure and not sent to the hospital). *Id.* ¶ 140(a), (c), (d), (g).

Mobile County itself articulated and endorsed the cost-cutting measures that NaphCare deploys: at an April 28, 2020 meeting on the renewal of NaphCare's contract, the County's own

Commissioners openly framed hospital referrals as a cost problem: the President of the Commission stated that "[t]he hospitals are where the real problems are at and where the real cost is coming in," and added: "If you have somebody who is in a severe situation such as a heart attack or something life-threatening, to not transfer them will save you about two thousand dollars ($2,000.00) per day." *Id.* ¶¶ 169-170; *see also id.* ¶ 7. Following that discussion, Mobile County voted to continue funding its contract with NaphCare, Sheriff Burch continued to implement the contract with NaphCare, and NaphCare continued to implement its unconstitutional policies. *Id.* ¶ 8. The County renewed the contract in 2021 and again in 2022. *Id.* ¶¶ 179, 181. As pleaded, because of these decisions by these institutional actors, as well as the conduct of their agents and employees, Mr. Locke was not timely referred to the hospital for his serious medical need, and he died. *Id.* ¶ 9.

## **STANDARD OF REVIEW**

Under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations as true and draw every reasonable inference in Plaintiff's favor. A complaint survives if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility "is not akin to a probability requirement," and the standard "does not require detailed factual allegations." *Id.* The Court asks only whether the complaint, taken as true, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A motion to dismiss tests pleading, not proof. Defendants' repeated invitations for the Court to draw "reasonable" inferences against Plaintiff—for example, that any treatment plan for Mr. Locke's hematomas "would have been put in place by [University of South Alabama

Hospital] . . . not NaphCare," Doc. 8 at 4-5; and that USAH discharged Mr. Locke "in a condition that did not require further hospitalization," Doc. 29-1 at 3; and that "a treatment plan was established by" USAH and that NP Erickson and Dr. Schulte simply continued it, Doc. 29-1 at 4-5—invert the standard. At Rule 12, every reasonable inference runs in Plaintiff's favor.

## ARGUMENT

I.  **The Complaint Plausibly Alleges That Erickson Acted With Deliberate Indifference to Mr. Locke's Serious Medical Needs.**

To plead a Fourteenth Amendment deliberate-indifference claim, Plaintiff must allege (1) an objectively serious medical need and (2) that Erickson responded to that need with deliberate indifference. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009); *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 (11th Cir. 2007). The deliberate-indifference prong itself has three elements: (i) subjective knowledge of a risk of serious harm; (ii) disregard of that risk; and (iii) by conduct that is more than mere negligence. *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). Pretrial-detainee claims under the Fourteenth Amendment are evaluated under the same standard. *Mann*, 588 F.3d at 1306. The Complaint pleads each element.

a.  **The Complaint Pleads Objectively Serious Medical Needs That Required Treatment at the Time NP Erickson Saw Mr. Locke.**

Erickson asserts that Plaintiff has not pled that Mr. Locke had an objectively serious medical need.  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mann*, 588 F.3d at 1307 (citation and internal quotation marks omitted). At its very outset, Erickson's argument selectively omits the key facts that placed her on notice of Mr. Locke's objectively serious medical needs.  Her argument begins:

> Here, Plaintiff alleges that NP Erickson was aware of Locke's age, unsteady gait, fall risk, history of alcohol use disorder, participation in a detox protocol, and alleged medication noncompliance, and contends—without factual support—that

these circumstances required referral to outside medical care. Plaintiff further asserts, in conclusory terms, that Locke exhibited "symptoms reflective of a serious neurological condition" and that NP Erickson should have performed a more extensive physical or neurological examination.

Doc. 29-1 at 8. But this characterization of Plaintiff's allegations omits the two most important facts establishing that Mr. Locke had an objectively serious medical need: (1) that when Erickson saw Mr. Locke, he had *just reported new falls in his cell*; and (2) that Mr. Locke had recently been hospitalized and diagnosed with numerous subdural hematomas—brain bleeds. Doc. 1, ¶¶ 53-54. Erickson was aware of both of those events. *Id.*

The Complaint pleads that Mr. Locke had bilateral subacute chronic subdural hematomas, a midline shift, moderate cerebral atrophy, and chronic small-vessel ischemic disease, all diagnosed by USAH physicians on imaging. Doc. 1, ¶¶ 23-24. He had received an MMA embolization on February 19, 2024, just four weeks before NP Erickson saw him. *Id.* ¶ 25. Bilateral subdural hematomas after embolization are, indisputably, "diagnosed by a physician as mandating treatment." *Mann*, 588 F.3d at 1307. The Complaint expressly pleads that NaphCare received Mr. Locke's USAH records on February 26, 2024, three weeks before the March 18 examination, and that those records reflected the hematomas and the embolization. Doc. 1, ¶ 35. It further pleads that Erickson reviewed Mr. Locke's chart and saw that Mr. Locke had CT scans that showed subdural hematomas in his brain on February 17 and 21. *Id.* ¶ 54. The Complaint pleads that on March 18, 2024, Mr. Locke reported to LPN Caulton that he had fallen multiple times in his cell, that Mr. Locke saw Erickson a half-hour after that report, and that Erickson knew of Mr. Locke's recent falls. *Id.* ¶¶ 50-53. Finally, it pleads that Mr. Locke had a serious medical need of which Ms. Erickson was aware. *Id.* ¶¶ 55, 57, 60. New falls in a 70-year-old detainee with bilateral chronic subdural hematomas, a documented fall risk, an unsteady gait, and recent untreated alcohol withdrawal reflect an obviously serious medical condition. A lay person

11

would recognize the necessity for evaluation and treatment; a nurse practitioner certainly would. *Mann*, 588 F.3d at 1307.

Erickson's motion tells on itself by selectively omitting the two most salient allegations. Instead, the motion identifies only allegations of the *other facts* Erickson knew that should have made it even more evident—in light of Mr. Locke's falls and diagnosed brain bleeds—that Mr. Locke had an objectively serious medical need:  his unsteady gait; his age; his fall risk; his history of alcohol use disorder; his need for a detoxification protocol; and his medication noncompliance.  *Id.* ¶¶ 54-57.  There is no serious contention that Mr. Locke did not have a serious medical need when Erickson saw him on March 18, 2024, or that the Complaint fails to plead such. *Id.* ¶¶ 55, 57, 60.

Erickson's motion goes onto argue that the complaint does not plausibly allege that Locke suffered a "sufficiently serious medical need that was caused or exacerbated by any action or omission attributable to NP Erickson or NaphCare."  Doc. 29-1 at 10.  A simple review of the complaint refutes this notion.  After Erickson saw Mr. Locke on March 18, 2024, following his falls and documented subdural hematomas, she returned him to his cell without any meaningful evaluation or treatment.  Neither Erickson nor any other medical or correctional staff monitored Mr. Locke over the next four days.  *Id*. ¶¶ 69-70.  On March 22, 2024, Erickson found Mr. Locke in his cell unresponsive, seizing, bleeding from the nose, and breathing heavily.  *Id*. ¶ 72.  After Mr. Locke was taken to the hospital, physicians determined that Mr. Locke's subdural hematoma had grown significantly and that he had a worsened midline shift.  *Id*. ¶ 76.  Mr. Locke developed pneumocephalus and continued to have seizures, ultimately passing away on April 24, 2024.  *Id*. ¶¶ 77-80.  The complaint thus pleads an evident throughline between Erickson's conduct and Mr. Locke's worsened condition—he arrived at MCMJ with a serious neurological

condition that Erickson knew about (including subdural hematomas and a midline shift), fell in his cell, was seen and ignored by Erickson following his falls, and subsequently suffered a severe worsening of his neurological condition.  Erickson's argument simply ignores the complaint's detailed allegations.

    **b.  The Complaint Plausibly Alleges That NP Erickson Had Subjective Knowledge of the Risk of Serious Harm.**

NP Erickson next contends that the Complaint fails to plead that she had "actual, subjective knowledge of a substantial risk of serious harm." Doc. 29-1 at 11. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (internal citations omitted). At the pleading stage, that means knowledge can be alleged circumstantially, and the obviousness of the risk supports an inference that the official knew of it.

The Complaint pleads facts that more than support an inference of NP Erickson's subjective knowledge of the serious risks to Mr. Locke. Erickson's brief concedes that the complaint alleges that she "was aware of Locke's age, unsteady gait, fall risk, history of alcohol use disorder, participation in a detox protocol, and alleged medication noncompliance." Doc. 29-1 at 5. The Complaint also pleads that NaphCare received Mr. Locke's USAH records on February 26, 2024, which reflected his bilateral subdural hematomas and embolization. Doc. 1, ¶ 35. The Complaint pleads that NP Erickson examined Mr. Locke's NaphCare chart on March 18, 2024 and saw that February 2024 CT scans showed that Mr. Locke had multiple subdural hematomas. *Id.* ¶¶ 52-55. And the Complaint pleads that Erickson was aware that on that same day, Mr. Locke reported recent falls in his cell. *Id.* ¶¶ 50-51, 53. A nurse practitioner who knows

her 70-year-old patient has bilateral chronic subdural hematomas that recently required embolization and hospitalization,[1] alcohol withdrawal, an unsteady gait, and newly reported falls cannot plausibly disclaim subjective knowledge of a substantial risk of neurological deterioration.

Erickson's contention that Mr. Locke did not exhibit "symptoms suggesting an impending seizure" on March 18, Doc. 29-1 at 12, misstates the legal standard. *Farmer* does not require allegations that a defendant knew the precise harm that would later occur; it requires only knowledge of "a substantial risk of serious harm." 511 U.S. at 842. The harm here was neurological deterioration; the risk was obvious from the information Erickson possessed and from Mr. Locke's contemporaneous report of falls. That the deterioration ultimately manifested as a seizure four days later is the consequence of the disregarded risk, not a defect in pleading it.

**c.  The Complaint Pleads Conduct That Goes Beyond Mere Negligence.**

Erickson's third argument is that, at most, the Complaint pleads negligence and a "hindsight disagreement" with her medical judgment. Doc. 29-1 at 9, 12. That argument depends on a factual premise the Complaint does not concede: that NP Erickson exercised medical judgment at all. The Complaint pleads that she did not.

Specifically, the Complaint pleads that, on March 18, 2024, faced with a 70-year-old detainee who had bilateral chronic subdural hematomas in his chart, a recent MMA embolization, untreated alcohol withdrawal, an unsteady gait, repeated medication refusals, and a

---

[1] Erickson also argues that the fact that Mr. Locke had recently been treated at a hospital in mid-February absolved Erickson of a responsibility to provide care to Plaintiff in mid-March. *See* Doc. 29-1 at 10. As discussed in greater detail in the section addressing Erickson's conduct below, *see infra* Sec. I.c, that Erickson knew Mr. Locke had recently been hospitalized for his severe neurological conditions, including multiple brain bleeds, is powerful evidence that Erickson subjectively knew that Mr. Locke required treatment and care after falling multiple times in his cell.

contemporaneous report of falls in his cell, Erickson: (i) failed to document the hematomas in her assessment, Doc. 1, ¶ 53; (ii) performed no neurological examination, *Id.* ¶ 54; (iii) ordered no imaging or diagnostic testing, *Id.* ¶ 55; (iv) developed no treatment plan, *Id.* ¶¶ 57-58; (v) did not refer Mr. Locke to an outside provider or hospital, *Id.* ¶¶ 60-62; and (vi) returned him to correctional housing. *Id.* ¶¶ 65-66. That is not a competing course of treatment; it is the absence of treatment.

The Eleventh Circuit has long recognized that a provider's decision to provide "cursory" or grossly inadequate treatment can constitute deliberate indifference, even where the provider performed some ministerial act. *McElligott v. Foley*, 182 F.3d 1248, 1255-58 (11th Cir. 1999) (reversing summary judgment for prison medical staff who saw inmate repeatedly but failed to investigate or treat his underlying condition). The "differing medical opinion" line of authority on which Erickson relies, *e.g.*, *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991), presupposes that a provider actually formed and exercised a medical opinion. Where a provider, instead, fails to perform the threshold examination, develop a treatment plan, or engage with the patient's known serious conditions, and simply sends a patient back to their cell, the issue is not which of two competing professional judgments is correct—it is that the provider's failures were so severe "as to amount to no care at all. *McElligott,* 182 F.3d at 1257. The Complaint pleads precisely that.

Likewise, *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995), and *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989), on which Erickson relies, address whether plaintiffs can second-guess the choice of one diagnostic technique over another after the provider has examined and assessed the patient. They do not insulate a provider who declines to assess or provide any treatment at all. Indeed, "the Eleventh Circuit has 'repeatedly condemned' the

conduct of individuals who outright ignore prisoners' medical needs." *Martinson v. S. Health Partners, Inc.*, 608 F. Supp. 3d 1107, 1111 (N.D. Ala. 2022); *see also Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) (noting that '[c]hoosing to deliberately disregard' an inmate's complaints of pain 'without any investigation or inquiry' is being willfully blind to pain.") (quoting *Goebert v. Lee County*, 510 F.3d 1312, 1328 (11th Cir. 2007). That is precisely what Plaintiff has alleged—that Erickson was confronted with a patient whom she knew had multiple brain bleeds and whom she knew had just fallen in his cell, and she nonetheless chose to do nothing to assess or treat Mr. Locke. This is precisely the circumstance in which court after court has held that a Plaintiff has adequately pled deliberate indifference. *See, e.g.*, *Martinson*, 608 F. Supp. 3d at 1111 (plaintiff adequately pled deliberate indifference where medical providers "allegedly knew [decedent] was exhibiting physical symptoms consistent with an overdose, yet [] provided no medical care[.]"); *Strickland v. Health Care Auth. of Cullman Cnty.*, No. 5:18-CV-01697-AKK, 2020 WL 109469, at *3 (N.D. Ala. Jan. 9, 2020) (plaintiff adequately pled deliberate indifference where she alleged that nurse sent detainee displaying signs of sepsis back to cell without treatment); *Hays v. Skoog*, No. 2:16-CV-00384-RDP, 2017 WL 897594, at *5 (N.D. Ala. Mar. 7, 2017) (plaintiff adequately pled deliberate indifference where medical provider provided some treatment for decedent's nausea, but did not direct medical staff to treat decedent's seizures).

Erickson's reliance on *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (a case addressing a failure of proof on summary judgment, not a motion to dismiss), for the proposition that an inmate "who receives a medical diagnosis and care cannot show deliberate indifference," Doc. 29-1 at 9, is similarly misplaced (and a misstatement of *Hamm*, which did not say that receipt of *any* care precludes a finding of deliberate indifference, but instead that the

16

plaintiff failed to show that the treatment he received was constitutionally inadequate). The Complaint does not allege that Mr. Locke received a diagnosis or treatment from Erickson that he disagreed with. It alleges that Erickson failed to address the diagnoses already in his chart, in combination with his recent falls, *at all*. In reality, Erickson's assertion—entirely unsupported by law—is that Erickson cannot be liable simply because she saw Mr. Locke after he reported his falls. *See* Doc. 29-1 at 11-12 (arguing that the fact that Mr. Locke "was promptly referred to the clinic and evaluated by NP Erickson the same day" negates "any inference that NP Erickson consciously disregarded a known risk of serious harm"). No law supports the proposition that medical providers are immunized from liability for ignoring serious risks simply because they saw the detainee.

Erickson's motion also asserts that she could not have been deliberately indifferent because "Locke was transferred to the University of South Alabama Hospital for evaluation and treatment following his initial booking on February 15, 2024," such that "upon his subsequent arrest and booking, he had already received hospital-level care and was discharged with a treatment and release plan." Doc. 29-1 at 10. That argument fails for multiple reasons. First, it confuses the existence of a serious medical need *at the time Erickson saw Mr. Locke on March 18, 2024* with whether a different provider had, weeks earlier, addressed an episode. Bilateral chronic subdural hematomas do not vanish after an embolization; they require ongoing monitoring and follow-up care, and the Complaint pleads that NaphCare had Mr. Locke's discharge records reflecting precisely that need and that Erickson was aware of Mr. Locke's condition. Doc. 1, ¶¶ 35, 53-54. More importantly, the new falls Mr. Locke reported on March 18 were a fresh medical event that arose *after* USAH's discharge and within the four walls of MCMJ. It is nonsensical to say that Erickson can be absolved of responsibility for her inaction

17

in response to events occurring on March 18 simply because Mr. Locke had been treated at a hospital weeks earlier.  To the contrary, that Erickson knew Mr. Locke's neurological condition recently required hospitalization is evidence that she knew she needed to evaluate and treat Mr. Locke on March 18, and that she was deliberately indifferent by choosing to simply send Mr. Locke back to his cell.

Throughout her brief, Erickson recasts the Complaint's allegations as describing "responsive care." Doc. 29-1 at 11-12. That recharacterization is the inverse of the Complaint's allegations. The Complaint pleads that she was confronted on March 18 with newly reported falls in a high-risk neurological patient and walked him out of the clinic without doing the basic examination, imaging, treatment, or referral that the obvious risk required. That is the antithesis of "responsive care." Whether the proof at trial will support the Complaint's allegations, or instead support NP Erickson's "responsive care" narrative, is a question for summary judgment or trial—not Rule 12. *Iqbal*, 556 U.S. at 678. The Complaint's allegations, taken as true and viewed in the light most favorable to Plaintiff, plead a deliberate indifference claim that clears the plausibility threshold.

## II.    The Complaint Plausibly Alleges Monell Liability Against NaphCare

A private corporation that contracts to provide medical care to inmates and pretrial detainees is subject to suit under § 1983 to the same extent as a municipality. *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997). To plead *Monell* liability, Plaintiff must allege (1) that Mr. Locke's constitutional rights were violated; (2) that NaphCare had a custom or policy that constituted deliberate indifference to that right; and (3) that the custom or policy caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). NaphCare's motion attacks the second and third prongs. The first—the underlying constitutional violation—is established for purposes of Rule 12 by the allegations discussed in Part I above with respect to Erickson, and

additionally by the allegations as to Dr. Schulte (Doc. 1, ¶ 46) and other NaphCare personnel (*id.* ¶¶ 33-49).

### a. The Complaint Identifies Specific NaphCare Customs With Detailed Factual Support

NaphCare's brief reduces the Complaint's Monell allegations to two short clauses pulled from paragraph 87 and then declares them conclusory. Doc. 8 at 13-14. That is a frivolous reading of Plaintiff's complaint. The customs identified at paragraph 87 are anchored by approximately nineteen pages of supporting factual allegations. Doc. 1 at pp. 13-32.

A "custom" for *Monell* purposes "must be persistent and widespread, so the [entity] had either actual or constructive knowledge of it." *Smothers v. Childers*, 159 F.4th 922, 931 (11th Cir. 2025). "A longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Id.* The Complaint identifies the relevant customs—that NaphCare healthcare personnel routinely fail to assess, monitor, and treat known serious medical issues, including head injuries and seizures, and routinely fail to refer or transfer inmates to outside providers when medically necessary, Doc. 1, ¶ 87— and then pleads the facts that show why those practices are corporate, not isolated.

*First*, the Complaint pleads a financial mechanism. NaphCare is paid on a fixed-fee basis, while the contracting county typically bears the cost of inmate transports and outside hospital care. Doc. 1, ¶¶ 114-116. NaphCare therefore profits, and its county counterparties save, by keeping inmates in the jail rather than transferring them. *Id.* ¶¶ 115-117. The Complaint pleads that NaphCare "routinely enters into contracts with counties that explicitly or implicitly disincentivize hospital referrals." *Id.* ¶ 119.

*Second*, the Complaint identifies an internal NaphCare instruction that translates the financial incentive into operational guidance. A former NaphCare physician assistant attests that

her supervisors instructed staff: "Don't send them out [to see outside physicians] unless you absolutely, positively have to." *Id.* ¶ 122. That is a direct allegation of a corporate-level instruction that mirrors and produces the second of the two pleaded customs.

*Third*, the Complaint pleads that NaphCare cuts costs by substituting LPNs for RNs, capturing approximately thirty percent in additional revenue, and that LPNs at NaphCare facilities routinely act beyond their limited scope of practice. *Id.* ¶¶ 126-127. That allegation explains why NaphCare's care is consistently inadequate across facilities.

These allegations are not "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. They are specific, factual allegations of corporate practices that, taken as true, plausibly establish customs of constitutional dimension. They suffice to state a claim that NaphCare has an unconstitutional custom. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1280 (11th Cir. 2016) (holding that Plaintiff stated *Monell* claim based on statements from third parties about government entity's conduct).

b. **NaphCare's Argument That Pattern Evidence from Other NaphCare Facilities "Has No Bearing" Misunderstands Both the Defendant and the Law**

Plaintiff did not simply stop at pleading NaphCare's nationwide customs—Plaintiff also pled dozens of examples of the disastrous ends of NaphCare's widespread practices. NaphCare's rejoinder to these robust pleadings is that "incidents at geographically distinct facilities involving different employees, different patients, different medical conditions, and different contractual arrangements have no relevant or connection to whether NaphCare maintained an unconstitutional custom at MCMJ." Doc. 8 at 14. That argument fails at every level.

### 1. *The relevant policymaker is NaphCare, not MCMJ.*

NaphCare is not a single-facility defendant. It is a multi-state corporate medical provider that contracts with jails across the country and—as the Complaint pleads—administers those

contracts pursuant to corporate-level policies, contracting practices, and operational instructions. Doc. 1, ¶¶ 83-86, 92-93, 113-127. NaphCare itself is the *Monell* defendant, and NaphCare's own policies and customs are what must be examined. 116 F.3d at 452. When the entity at issue is a corporation that operates dozens of facilities, the inquiry necessarily looks across the entity's footprint to determine what its corporate customs and policies are. NaphCare's policies and customs are corporate, they manifest at every facility NaphCare operates, and pattern evidence from those facilities is direct evidence of the existence and extent of those customs.

NaphCare's argument inverts that structure. It would treat MCMJ as the relevant entity and NaphCare merely as the staffing agency, ignoring that the Complaint expressly pleads NaphCare's corporate-level practices. Adopting NaphCare's framework would mean that a corporate medical contractor operating in multiple jurisdictions could disclaim its own corporate policies and widespread practices whenever a plaintiff happened to be injured at one of its facilities. This is simply not how *Monell* operates.

NaphCare leans on *Craig v. Floyd County*, 643 F.3d 1306 (11th Cir. 2011), for the proposition that the pattern inquiry is limited to "the specific governmental unit at issue." Doc. 8 at 14. But *Craig* involved a county sheriff's office—a single, geographically defined public-entity defendant. There were no "other facilities" because the defendant operated none. *Craig*'s reference to the "specific governmental unit at issue" reflects the case's facts, not a categorical bar on evidence from a corporate defendant's parallel conduct elsewhere. The Eleventh Circuit has never held that pattern evidence under *Monell* is confined to the four walls of a single facility, and good reason: such a rule would gut the application of *Monell* to multi-state corporate defendants. Numerous courts within the Eleventh Circuit have relied on a single governmental or corporate entity's practices across multiple facilities. *See, e.g., Kendall v. Fulton Cnty.,*

21

*Georgia*, No. 1:23-CV-00416-JPB, 2024 WL 1242463, at *7–8 (N.D. Ga. Mar. 22, 2024) (relying on allegations of NaphCare's deficient practices nationwide in denying motion to dismiss *Monell* claim); *Heath v. Miami-Dade Cnty.*, 736 F. Supp. 3d 1149, 1160 (S.D. Fla. 2024) (relying on allegations against County across facilities in denying motion to dismiss Monell claim); *Herr v. Armor Corr. Health Servs., Inc.*, No. 619CV394ORL37EJK, 2019 WL 12021672, at *5 (M.D. Fla. Sept. 9, 2019) (relying on allegations of nationwide inadequate provision of medical care in denying corporate medical provider's motion to dismiss *Monell* claim).  NaphCare does not cite a single case for the proposition that a *Monell* defendant's practices across facilities are irrelevant or must be artificially cordoned off and ignored. NaphCare cannot identify such a case because it would stand for the absurd proposition that a corporate entity's unconstitutional conduct must be ignored because it is *too widespread*.

### 2. The Complaint pleads the same two customs operating across NaphCare's facilities.

NaphCare characterizes the cross-facility allegations as involving "different medical conditions" with no "relevant connection" to the customs alleged here. That mischaracterizes paragraph 106. Each of the more than twenty incidents pleaded at paragraph 106(a)-(x) involves the same two customs the Complaint identifies—a failure to assess, monitor, or treat a known serious medical condition, and a failure to refer or transfer the inmate to an outside provider when medically necessary. The decedents' underlying conditions vary, but the operative custom does not. That recurrence—across facilities, across years, across patient profiles—is itself the strongest evidence that the customs are corporate.

Pattern evidence under *Monell* is not just probative of an entity's customs; it is also probative of the entity's notice. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). NaphCare's prior incidents, which include multimillion-dollar verdicts, government investigations, and public

22

reports, establish that NaphCare was on notice that the same two customs were producing the same kind of harm across its facilities, and that NaphCare nevertheless persisted in those customs. That is the textbook *Monell* pattern.

Even setting aside the cross-facility allegations, the Complaint pleads a pattern of preventable in-custody deaths at MCMJ during NaphCare's tenure as the medical contractor. Doc. 1, ¶ 140(a)-(h). NaphCare brushes those allegations aside as "cherry-picked" because they span 2015 and 2023-2024, but a Rule 12 motion is not a vehicle for weighing pattern evidence. Plaintiff pled several incidents in close temporal proximity to Mr. Locke's death wherein inadequate medical care at MCMJ resulted in an inmate's death.  *See, e.g.*, Doc. 1, ¶ 140(c) (detainee found deceased in 2023 cell from treatable condition); ¶ 140(d) (detainee died in 2024 medical cell after arriving at MCMJ with serious injuries and not being referred to the hospital); ¶ 140(g) (detainee died in 2024 after complaining of chest pains and heart failure and being denied hospital referral).  At the pleading stage, the question is whether the Complaint plausibly alleges that NaphCare's customs operated at MCMJ. The Complaint more than clears that low bar—indeed, it pleads specific MCMJ deaths in support, in addition to a robust corpus of nationwide incidents in which inadequate medical treatment by NaphCare resulted in deaths.

NaphCare protests that "[t]he Complaint is devoid of allegations that MCMJ's contract with NaphCare had similar provisions" to those alleged elsewhere. Doc. 8 at 16. Not so. The Complaint pleads that Mobile County considered the cost of inmate hospital transports a major financial pressure, Doc. 1, ¶¶ 165-168; that a Mobile County Commissioner explicitly stated in a 2020 Board meeting that not transferring critically ill inmates "will save you about two thousand dollars ($2,000.00) per day," *Id.* ¶¶ 169-170; see also *Id.* ¶ 7; and that Mobile County thereafter renewed its contract with NaphCare and approved millions of dollars in payments, *Id.* ¶¶ 162,

23

164, 171-184. Those allegations plausibly tie NaphCare's cost-cutting custom to MCMJ. Regardless, the specific terms of NaphCare's contracts in various jurisdictions are certainly not required at the pleadings stage—Plaintiff has supplied robust pleadings alleging a nationwide pattern of constitutionally inadequate medical care by NaphCare, to which Mr. Locke fell victim.

c. **The Complaint Plausibly Alleges That NaphCare's Customs Were the Moving Force Behind Mr. Locke's Death**

NaphCare argues, finally, that the Complaint contains "no facts" linking its customs to Mr. Locke's death. Doc. 8 at 17. The opposite is true. As Section I sets out in detail, the Complaint pleads a direct causal chain: Mr. Locke entered MCMJ with a known history of bilateral subdural hematomas, a recent MMA embolization, alcohol use disorder requiring detoxification, chronic disequilibrium, and a documented fall risk, Doc. 1, ¶¶ 21-32; despite that knowledge, NaphCare did not place him on a detoxification protocol, did not consistently administer his prescribed medications, and did not respond to his thirteen medication refusals over the following four weeks, *Id.* ¶¶ 33-49; on March 18, 2024, after Mr. Locke reported recent falls in his cell, NaphCare's nurse practitioner failed to perform a neurological examination, failed to develop a treatment plan, and failed to refer him to a hospital, *Id.* ¶¶ 50-66; and four days later, Mr. Locke was found unresponsive and seizing in his cell, transferred at last to a hospital, and died on April 24, 2024, *Id.* ¶¶ 71-72, 79-80.

The Complaint expressly pleads that NaphCare's two customs were the moving force behind the unconstitutional conduct that produced this outcome. *Id.* ¶ 95. And it pleads that, but for those customs, Mr. Locke would have been transferred earlier and would have received consistent imaging, monitoring, and timely surgical intervention when the need arose. *Id.* ¶¶ 81-82. Indeed, what happened to Mr. Locke naturally flows from the two customs identified by Plaintiff: in accordance with NaphCare's customs, it failed to timely refer Mr. Locke to a

hospital for treatment and it failed to assess, monitor, and treat Mr. Locke's grave neurological condition.  That is the direct causal link between custom and constitutional injury that *Monell* requires. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  NaphCare's contention that "Locke was sent out as upon notification of a serious health condition," Doc. 8 at 17, does not defeat causation; it confirms it. By the time NaphCare finally transferred Mr. Locke, he was unresponsive, seizing, and bleeding from the nose. Doc. 1, ¶¶ 71-72. The Complaint's allegation is precisely that NaphCare's customs caused him to remain in the jail, untreated, until that point.  *See Smothers v. Childers*, 159 F.4th 922, 934 (11th Cir. 2025) (holding that plaintiff made a plausible showing that County's continued use of a contractor that provided inadequate medical care was moving force behind detainee's death).[2]

Equally unavailing is Erickson's contention—incorporated by NaphCare—that Mr. Locke's eventual cause of death (acute hypoxic respiratory failure secondary to aspiration pneumonia and septic shock) is "clinically distinct from, and unrelated to, the circumstances for which he was initially admitted to the hospital." Doc. 29-1 at 6. That assertion contradicts the Complaint, which pleads an unbroken causal chain from NaphCare's and NP Erickson's failures of March 18 to Mr. Locke's collapse on March 22 to his death on April 24. Doc. 1, ¶¶ 50-82; *see also* Sec. I(a), *supra* (addressing Erickson's causation argument). At Rule 12, every reasonable

---

[2] There is no principled distinction between *Smothers* and this case. The Eleventh Circuit ruled that a county had to stand trial for deliberate indifference where it continued to contract with a medical provider with a history of inadequate care for cost-cutting purposes, and where the decedent died following receipt of inadequate care by the contractor.  *Smothers*, 159 F.4th at 934. So too with Mr. Locke and NaphCare—the complaint alleges, with ample factual support, that NaphCare's failure to treat Mr. Locke and his resulting injury and death flowed directly from NaphCare's widespread practice of failing to make necessary referrals and failing to adequately monitor, assess, and treat detainees and inmates.

inference is drawn for Plaintiff. Plaintiff has more than adequately pled that NaphCare's

unconstitutional customs were a moving force behind Mr. Locke's injuries and death.

**III.    The Alabama Medical Liability Act ("AMLA") Does Not Warrant Dismissal of Plaintiff's Negligence Claims Against Either Defendant.**

Both Defendants argue that Plaintiff's negligence claims fail to satisfy the heightened

pleading requirement of Ala. Code § 6-5-551 because, in their view, the Complaint does not

"expressly plead the employee alleged to have breached the applicable standard of care" or

provide "the requisite specification and factual detail" of that employee's conduct. Doc. 8 at 18;

Doc. 29-1 at 13-14. Those arguments are wrong on multiple levels: the AMLA's heightened

pleading standard does not apply in federal court, and even if it did, Plaintiff has pled more than

what is required by the statute (and far more than is required by Rule 8).

**a.   AMLA's Heightened Pleading Standard Does Not Apply in Federal Court**

The fundamental problem with defendants' AMLA argument is that "AMLA's

heightened pleading standard does not apply in federal court." *Oltmer v. Colbert Cnty. Ala.*, No.

3:25-CV-765-HDM, 2026 WL 524774, at *5 (N.D. Ala. Feb. 25, 2026). "When federal courts

consider state law claims under either diversity jurisdiction or pendent jurisdiction, 'only

substantive state law must be applied,' while 'federal law governs matters of procedure.'" *Id*.

(quoting *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S.*, P.A., 781 F.3d 1245, 1259

(11th Cir. 2015)). "[W]here a state . . . requires heightened pleading requirements in the

complaint, 'state pleading rules … do not apply in federal court." *Palm Beach Golf*, 781 F.3d at

1260. "[W]here a state employs a heightened pleading requirement, a federal court … should

instead follow Fed. R. Civ. P. 8(a)." *Id*. AMLA's heightened pleading standard accordingly

does not apply to this action. Both defendants' arguments regarding the sufficiency of the

medical negligence allegations rely exclusively on the AMLA standard; neither Erickson nor

26

NaphCare argue that Plaintiff has not met the applicable Rule 8 pleading standard. Accordingly, the Court should reject defendants' arguments on the sufficiency of plaintiff's pleading of state law claims, which are entirely premised on an inapplicable standard.

### b. The Complaint Satisfies Both AMLA's Requirements and Rule 8

AMLA provides that "[t]he plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts." Ala. Code § 6-5-551. The *Husby* line of authority on which Defendants rely requires that, where the defendant is a corporate medical provider, "the focus should be on the individual [person] whose specific action is alleged to have fallen below the standard of care." *Husby v. South Ala. Nursing Home, Inc.*, 712 So. 2d 750, 753 (Ala. 1998); see also *Mikkelsen v. Salama*, 619 So. 2d 1382, 1384 (Ala. 1993) ("although every element of the cause of action need not be stated with particularity, the plaintiff must give the defendant health care provider fair notice of the allegedly negligent act and must identify the time and place it occurred and the resulting harm."). The Complaint easily satisfies AMLA's requirements.

The Complaint identifies, by name and by specific conduct, the NaphCare providers whose acts and omissions support the negligence claims. Nurse Angela Ingram conducted the February 23, 2024 booking screening and identified the need for placement in administrative segregation, low-tier-bunk placement, detox watch, an alcohol-withdrawal treatment plan, and Keppra prophylaxis—yet the Complaint pleads that no detoxification protocol was in fact implemented. Doc. 1, ¶¶ 31, 33. Dr. William Schulte examined Mr. Locke on March 11, 2024, reviewed his chart, documented Mr. Locke's prior CT scans showing subdural hematomas, and yet failed to develop a treatment plan or refer him to an outside provider. *Id.* ¶ 46. LPN Sheila

27

Caulton received Mr. Locke's report on March 18, 2024 that he had fallen in his cell several times, and referred him to clinic without conducting a meaningful examination of her own. *Id.* ¶¶ 50-51. And Nurse Practitioner Katie Erickson, later that same day, examined Mr. Locke, declined to document his hematomas, performed no neurological assessment, developed no treatment plan, and did not refer him to a hospital. *Id.* ¶¶ 52-66.

For each of those providers, the Complaint pleads the date, the place, the conduct undertaken, and the conduct omitted. That is precisely the "detailed specification and factual description of each act and omission" the AMLA contemplates, supplied with the "date, time, and place of the act or acts" "when feasible and ascertainable." Ala. Code § 6-5-551.

NP Erickson's individual AMLA argument fares no better. Her brief asserts that the Complaint "identifies no specific act or omission attributable to NP Erickson during that period beyond generalized assertions that she should have performed a neurological examination or a more extensive physical assessment." Doc. 29-1 at 13. The Complaint does considerably more. It pleads that Erickson examined Mr. Locke at the MCMJ clinic on March 18, 2024 (*id.* ¶ 52); reviewed his chart and was on notice of his bilateral subdural hematomas, recent MMA embolization, alcohol use disorder, and documented fall risk (*id.* ¶¶ 53-55); declined to document the hematomas in her assessment (*id.* ¶ 53); failed to perform any neurological examination (*id.* ¶ 54); failed to order any imaging or diagnostic testing (*id.* ¶ 55); failed to develop any treatment plan (*id.* ¶¶ 57-58); failed to refer Mr. Locke to a hospital or other outside provider despite his reports of recent falls (*id.* ¶¶ 60-62); and returned him to housing (*id.* ¶¶ 65-66). The when (March 18, 2024), the where (the MCMJ clinic), the who (Nurse Practitioner Erickson), and the what (a long list of specific acts and omissions) are all there. And as discussed at length above, Plaintiff pled facts plausibly indicating that Erickson was not merely negligent,

but deliberately indifferent to Plaintiff's serious medical needs. Plaintiff stated a claim for medical negligence against Erickson and NaphCare even if the heightened pleading standard were to apply.

Erickson contends that *Gunter v. Advanced Correctional Healthcare, Inc.*, 844 F. App'x 189 (11th Cir. 2021), "squarely supports dismissal here." Doc. 29-1 at 13. It does not. The plaintiff in *Gunter* alleged only that the defendants "knew or should have known" of generalized risks of suicide in patients with substance abuse disorders and in detox, *id.* at 194—a generic, untethered allegation. The Complaint here is the opposite. It identifies Erickson by name; pleads the specific date, place, and clinical context of her encounters with Mr. Locke; and enumerates the specific acts she undertook and omitted. *See* Doc. 1, ¶¶ 52-66. That is the "specification and factual description" § 6-5-551 contemplates. *Gunter*'s deficiencies are absent.

Defendants also fault the Complaint for not "identify[ing] the applicable standard of care" or "which medical or nursing specialty's standard of care is implicated." Doc. 8 at 19; *see also* Doc. 29-1 at 14-15. Section 6-5-551 imposes no such requirement. The statute requires a specification of the alleged acts and omissions; it does not require a plaintiff to plead the elements of expert testimony at the complaint stage. *See Hays v. Skoog*, No. 2:16-CV-00384-RDP, 2017 WL 897594, at *7 (N.D. Ala. Mar. 7, 2017) ("Defendant's argument implies that Plaintiff must establish the relevant standard of care at the pleading stage. Such a requirement, however, would obligate Plaintiff to present expert evidence from a medical practitioner at the pleading stage, a requirement not imposed by Alabama law.").

Erickson's parallel demand that the Complaint plead facts "explaining why the failure to perform those assessments fell below the applicable standard of care for a nurse practitioner or how performing them would have altered Locke's clinical course or outcome," Doc. 29-1 at 14-

29

15, similarly conflates pleading with proof. AMLA does not require a plaintiff to prove causation in the complaint; it requires a specification of the acts and omissions. The Complaint provides that specification, and discovery and expert disclosure will provide the rest.

## **CONCLUSION**

For the foregoing reasons, the motions to dismiss filed by NaphCare and Erickson should be denied. In the alternative, if the Court finds any portion of the Complaint deficient, Plaintiff respectfully requests leave to amend.

/s/ Sam Harton

Romanucci and Blandin, LLC
Sam Harton (*pro hac vice*)
321 N. Clark St.
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: sharton@rblaw.net

Aaron Maples
Brendan Connick
Maples & Connick
733 Dante Street, Suite H
New Orleans, LA 70118
Tel: 504-269-3870
aaron@maplesconnick.com
brendan@maplesconnick.com